UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

_____

HELEN JANE WILSON, VALERIE WILSON    :
HUDSON, CYNTHIA LAHNE, MELANIE ANN    :
NICHOLSON, TIM WILLIAM RUSSELL,    :
CHAIM WINTERNITZ, A.W., By and Through    :
His Parents and Guardians CHAIM WINTERNITZ :
and ESTHER WINTERNITZ, B.W., By and    :
Through Her Parents and Guardians, CHAIM    :
WINTERNITZ and ESTHER WINTERNITZ,    :
D.W., By and Through Her Parents and Guardians    :
CHAIM WINTERNITZ and ESTHER    :
WINTERNITZ, M.W., By and Through Her    :
Parents and Guardians CHAIM WINTERNITZ and :
ESTHER WINTERNITZ, M.W., By and Through    :
His Parents and Guardians CHAIM WINTERNITZ :
and ESTHER WINTERNITZ, ESTER    :
WINTERNITZ, FAIGE WINTERNITZ, JACOB    :
WINTERNITZ, MOSHE WINTERNITZ, YITEL    :
WINTERNITZ, ESTATE OF JUSTIN SHULTS,    :
By and Through Its Administratrix, SHEILA    :
SHELL, SHEILA SHELL, JEFFREY SHULTS,    :
TIFFANY SHULTS-RISTINE, LEVI SUTTON,    :
ESTATE OF STEPHANIE MOORE-SHULTS,    :
By and Through Its Executor CAROLYN G.    :
MOORE, CAROLYN G. MOORE, GEARY    :
MOORE, HOLLY E. WOOD, ESTATE OF    :
JAMES LOGAN GRAGG, By and Through Its    :
Executrix GLENDA S. GRAGG, TRELLA    :
ELIZABETH NEWSOM, ESTATE OF    :
GAIL MINGLANA MARTINEZ, By and Through :
its Heir MELCHIZEDEK MARTINEZ,    :
MELCHIZEDEK MARTINEZ, KIANNI    :
MARTINEZ, KA.M., By and Through    :
Her Parent and Guardian MELCHIZEDEK    :
MARTINEZ, KIMO MARTINEZ, N.M., By and    :
Through Her Parent and Guardian MELCHIZEDEK:
MARTINEZ, ROSIE T. MARTINEZ, MARIA    :
LUISA MARTINEZ, ANGELITO MINGLANA,    :
SR., TEOFISTA MINGLANA, GERARD    :
MINGLANA, GILDA MINGLANA-HARWOOD,  :
ANGELITO MINGLANA, JR., ANGELO    :
MINGLANA, JOSEPH D. EMPEY, AMBER    :
ORTON-EMPEY, JOSEPH C. EMPEY,    :
DOROTHY EMPEY, HENRY EMPEY,    :

1

ISABELLE EMPEY, ABRAHAM EMPEY,          :
RICHARD I. NORBY, PAMELA J. NORBY,       :
TIFFANY ALLRED, JASON NORBY, CHELSEA :
SNELL, MASON WELLS, CHAD S. WELLS,       :
KYMBERLY E. WELLS, PORTER J. WELLS,      :
MIA WELLS, T.W., By and Through Her Parents  :
and Natural Guardians, CHAD S. WELLS AND  :
KYMBERLYE. WELLS, and COLBY S. WELLS  :
                                        :
                PLAINTIFFS,             :
                                        :
        V.                              :
                                        :
LAFARGE, S.A., LAFARGE CEMENT           :
HOLDING LIMITED, LAFARGE CEMENT         :
SYRIA S.A, HOLCIM LTD and               :
HOLCIM (US) Inc.                                    :
                                        :
        DEFENDANTS.                     :
_____ :

## INTRODUCTION

1.      This lawsuit seeks damages under the federal Anti-Terrorism Act, 18 U.S.C. § 2333, on

behalf of American civilians who were killed or wounded. during the coordinated Paris terrorist attacks,

particularly the Bataclan Theatre attack committed on November 13, 2015 ("Paris Bataclan Theatre

Terrorist Attack" or "Paris Bataclan Attack") and the suicide bombing terrorist attacks committed at the

Brussels Airport in Brussels, Belgium on March 22, 2016 ("Brussels Airport Attack"). These attacks

were carried out by a Foreign Terrorist Organization ("FTO"), THE ISLAMIC STATE (a.k.a. "ISIS,"

"ISIL," or "IS") so designated by the U.S. Department of State on December 17, 2004 which Defendants

Lafarge S.A. ("Lafarge"), Lafarge Cement Holding Limited ("LaFarge Cyprus"), and Lafarge Cement

Syia S.A (individually, "LCS") (collectively, "Lafarge Defendants" ) helped finance and logistically aid.

Specifically, from August 2013 through October 2014, the Lafarge Defendants – themselves and through

their intermediary partners, consultants, and subcontractors – made substantial payments to ISIS in

2

exchange for permission to operate a cement plant in Syria from August 2013 to October 2014, which enabled LCS to obtain approximately $70.30 million in revenue.

2.        On July 10, 2015, Lafarge was acquired in its entirety by Holcim, Ltd also known as Holcim AG ("Holcim"), a publicly traded Swiss multinational building materials corporation with offices worldwide.  Lafarge is believed to have become merged into and/or is now a wholly owned subsidiary and an alter ego affiliate of Defendants Holcim or and Holcim (US) Inc. ("Holcim US") (collectively "Holcim Defendants") respectively. As a result of additional corporate restructuring transactions, Holcim temporarily was doing business as LafargeHolcim and subsequently now has reverted to doing business as Holcim. Holcim has recently announced that it is restructuring its US operations intending to spin-off said US operations to become known as Amrize, expected to occur before May 2025.  A search of Holcim.com on February 23, 2025 and related internet searches provide information that the Holcim Defendants are beneficial owners and are successors in interest to the Lafarge Defendants, assuming all rights, obligations, liabilities, standing and other corporate interests thereto.   Accordingly, the Holcim Defendants, as successors in interest to the Lafarge Defendants and for such other reasons as set forth below are named herein for all purposes and included within the definition of "Defendants".

3.        Plaintiffs are U.S. citizens, and their family members, who were killed or wounded in terrorist attacks committed by ISIS, as part of global anti-American terrorist coalitions.   Plaintiffs are entitled to recover for the deaths and/or injuries they suffered in attacks where they or others were killed, resulting in their injuries under the federal Anti-Terrorism Act ("ATA"), through which the Lafarge Defendants and their successors in interest, the Holcim Defendants are liable because they aided and abetted ISIS terrorist attacks, including but not limited to the Paris Bataclan Attack and Brussels Airport Attack. 18 U.S.C. § 2333(d)(2). Plaintiffs accordingly seek justice under the ATA's aiding-and-abetting

provision, which Congress enacted "to provide civil litigants with the broadest possible basis, consistent with the Constitution of the United States, to seek relief against persons, entities, and foreign countries, wherever acting and wherever they may be found, that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." Justice Against Sponsors of Terrorism Act ("JASTA") § 2(b), Pub. L. No. 114-222, 130 Stat. 852, 853 (2016).

Plaintiffs state in support of their Complaint and allege the following:

## The Plaintiffs

## Wilson Plaintiffs

4.      Plaintiff, Helen Jane Wilson ("Ms. Wilson") was present and severely and permanently injured in the Paris Bataclan Attack, which was committed by ISIS, a FTO. At the time of the acts alleged, and at all other times relevant hereto, Ms. Wilson was a United States citizen. Plaintiff Helen Jane Wilson can sue and be sued in this Court.

5.      Plaintiff Valerie Wilson-Hudson was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Valerie Wilson-Hudson has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Attack. Plaintiff Valerie Wilson-Hudson can sue and be sued in this Court.

6.      Plaintiff Cynthia Lahne was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Cynthia Lahne has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Attack. Plaintiff Cynthia Lahne can sue and be sued in this Court.

7.     Plaintiff Melanie Ann Nicholson was, and at all times relevant hereto, the biological sister of Helen Jane Wilson, and a citizen of the United States. Plaintiff Melanie Ann Nicholson has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her sister, Ms. Wilson, suffered in the Paris Bataclan Attack. Plaintiff Melanie Ann Nicholson can sue and be sued in this Court.

8.     Plaintiff Tim Russell was, and at all times relevant hereto, the biological brother of Helen Jane Wilson, and a citizen of the United States. Plaintiff Tim Russell has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries his sister, Ms. Wilson, suffered in the Paris Bataclan Attack. Plaintiff Tim Russell can sue and be sued in this Court.

**Winternitz Family**

9.     Plaintiff Chaim Winternitz ("Mr. Winternitz") was present and severely and permanently injured in the Brussels Airport Attack, which was committed by ISIS, a FTO. Plaintiff Mr. Winternittz. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries he suffered in the Brussels Airport Attack and the injuries his daughter, B.W., suffered in the Brussels Airport Attack.   At the time of the acts alleged, and at all other times relevant hereto, Mr. Winternitz was a United States citizen. Plaintiff Chaim Winternitz can sue and be sued in this Court.

10.     Plaintiff Jacob Winternitz was, at all times relevant hereto, the biological father of Chaim Winternitz, and a United States citizen. Plaintiff Jacob Winternitz has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries his son, Mr. Winternitz, suffered in the Brussels Airport Attack.  Plaintiff Jacob Winternitz can sue and be sued in this Court.

11.     Plaintiff Moshe Winternitz was, at all times relevant hereto, the biological brother of Chaim Winternitz, and a United States citizen. Plaintiff Moshe Winternitz has suffered severe mental

anguish and extreme emotional pain and suffering as a result of the injuries his brother, Mr. Winternitz, suffered in the Brussels Airport Attack.  Plaintiff Moshe Winternitz can sue and be sued in this Court.

12.    Plaintiff Ester Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Ester Winternitz has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her brother, Mr. Winternitz, suffered in the Brussels Airport Attack.  Plaintiff Ester Winternitz can sue and be sued in this Court.

13.    Plaintiff Faige Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Faige Winternitz has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her brother, Mr. Winternitz, suffered in the Brussels Airport Attack.  Plaintiff Faige Winternitz can sue and be sued in this Court.

14.    Plaintiff Yitel Winternitz was, at all times relevant hereto, the biological sister of Chaim Winternitz, and a United States citizen. Plaintiff Yitel Winternitz has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her brother, Mr. Winternitz, suffered in the Brussels Airport Attack.   Plaintiff Yitel Winternitz can sue and be sued in this Court.

15.    Plaintiff B.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff B.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries she suffered in the Brussels Airport Attack and the injuries her father, Mr. Winternitz, suffered in the Brussels Airport Attack.   Plaintiff B.W. can sue and be sued in this Court.

16.    Plaintiff D.W., a minor born December XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff D.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her father, Mr.

Winternitz, suffered in the Brussels Airport Attack, and sister, B.W., suffered in the Brussels Airport Attack.   Plaintiff D.W. can sue and be sued in this Court.

17.     Plaintiff M.W., a minor born July XX, 20XX, was, at all times relevant hereto, the biological daughter of Chaim Winternitz, and a United States citizen. Plaintiff M.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries her father, Mr. Winternitz, suffered in the Brussels Airport Attack and sister, B.W., suffered in the Brussels Airport Attack.   Plaintiff M.W. can sue and be sued in this Court.

18.     Plaintiff A.W., a minor born April XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff A.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries his father, Mr. Winternitz, suffered in the Brussels Airport Attack and sister, B.W., suffered in the Brussels Airport Attack.   Plaintiff A.W. can sue and be sued in this Court.

19.     Plaintiff M.W., a minor born January XX, 20XX, was, at all times relevant hereto, the biological son of Chaim Winternitz, and a United States citizen. Plaintiff M.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries his father, Mr. Winternitz, suffered in the Brussels Airport Attack and sister, B.W., suffered in the Brussels Airport Attack. Plaintiff M.W. can sue and be sued in this Court.

**The Shults Plaintiffs**

20.     Plaintiff Estate of Justin Shults ("Justin"), a Sevier County, Tennessee estate, is represented in this action by its duly appointed Administratrix, Sheila Shell. Justin was, and at all times relevant hereto, the husband of Stephanie Moore-Shults. Justin was murdered in the Brussels Airport Attack, which was committed by ISIS, a FTO.   At the time of the acts alleged, and at all other times

relevant hereto, Justin was a citizen of the United States. Plaintiff Estate of Justin Shults can sue and be sued in this Court.

21.    Plaintiff Sheila Shell was, and at all times relevant hereto, the biological mother of Justin Shults, and a citizen of the United States. Plaintiff Sheila Shell has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her son, Justin, in the Brussels Airport Attack. Plaintiff Sheila Shell can sue and be sued in this Court.

22.    Plaintiff Jeffrey Shults was, and at all times relevant hereto, the biological father of Justin Shults, and a citizen of the United States. Plaintiff Jeffrey Shults has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his son, Justin, in the Brussels Airport Attack. Plaintiff Jeffrey Shults can sue and be sued in this Court.

23.    Plaintiff Tiffany Shults-Ristine was, and at all times relevant hereto, the biological sister of Justin Shults, and a citizen of the United States. Plaintiff Tiffany Shults-Ristine has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her brother, Justin, in the Brussels Airport Attack. Plaintiff Tiffany Shults-Ristine can sue and be sued in this Court.

24.    Plaintiff Levi Sutton was, and at all times relevant hereto, the biological brother of Justin Shults, and a citizen of the United States. Plaintiff Levi Sutton has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his brother, Justin, in the Brussels Airport Attack. Plaintiff Levi Sutton can sue and be sued in this Court.

**The Moore Plaintiffs**

25.    Plaintiff Estate of Stephanie Moore-Shults ("Stephanie"), a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executor, Carolyn G. Moore. Stephanie was, and at all times relevant hereto, the wife of Justin Shults. Stephanie was murdered in the Brussels Airport Attack, which was committed by ISIS, a FTO.   At the time of the acts alleged, and at all other times

relevant hereto, Stephanie was a citizen of the United States. Plaintiff Estate of Stephanie Moore-Shults can sue and be sued in this Court.

26.     Plaintiff Carolyn G. Moore ("Carolyn") was, and at all times relevant hereto, the biological mother of Stephanie Moore-Shults, and a citizen of the United States. Plaintiff Carolyn G. Moore was also at the Brussels Airport at the time of the attack by ISIS and was physically injured in the Brussels Airport Attack. Carolyn G. Moore has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries and as a result of the murder of her daughter, Stephanie, in the Brussels Airport Attack.   Plaintiff Carolyn G. Moore can sue and be sued in this Court.

27.     Plaintiff Geary Moore was, and at all times relevant hereto, the biological father of Stephanie Moore-Shults, the spouse of Carolyn G. Moore, and a citizen of the United States. Plaintiff Geary Moore has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter, Stephanie, and also as a result of the injuries to his wife, Carolyn G. Moore, in the Brussels Airport Attack. Plaintiff Geary Moore can sue and be sued in this Court.

28.     Plaintiff Holly E. Wood was, and at all times relevant hereto, the biological sister of Stephanie Moore-Shults, the daughter of Carolyn G. Moore and a citizen of the United States. Plaintiff Holly E. Wood has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her sister, Stephanie, and also as a result of the injuries to her mother, Carolyn, in the Brussels Airport Attack. Plaintiff Holly E. Wood can sue and be sued in this Court.

29.     Plaintiff Estate of James Logan Gragg, a Fayette County, Kentucky estate, is represented in this action by its duly appointed Executrix, Glenda S. Gragg. James Logan Gragg was, and at all times relevant hereto, the biological brother of Carolyn G. Moore and a citizen of the United States. James Logan Gragg suffered severe mental anguish and extreme emotional pain and suffering as a result of the

injuries to his sister, Carolyn, in the Brussels Airport Attack. Plaintiff Estate of James Logan Gragg can sue and be sued in this Court.

30.     Plaintiff Trella Elizabeth Newsom was, and at all times relevant hereto, the biological sister of Carolyn G. Moore and a citizen of the United States. Plaintiff Trella Elizabeth Newsom has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her sister, Carolyn, in the Brussels Airport Attack. Plaintiff Trella Elizabeth Newsom can sue and be sued in this Court.

**The Martinez Plaintiffs**

31.     Plaintiff Estate of Gail Martinez ("Gail"), by and through its Heir Melchizedek Martinez, is a Plaintiff in this action. Gail was, and at all times relevant hereto, the wife of Melchizedek Martinez. Gail was murdered in the Brussels Airport Attack which was committed by ISIS, a FTO.   At the time of the acts alleged, and at all other times relevant hereto, Gail was a citizen of the United States. Plaintiff Estate of Gail Martinez by and through its Heir Melchizedek Martinez can sue and be sued in this Court.

32.     Plaintiff Melchizedek Martinez ("Kato") was, and at all times relevant hereto, the husband of Gail Martinez, and a citizen of the United States. Plaintiff Melchizedek Martinez and all of his and Gail's children were also present at the Brussels Airport at the time of the attack committed by ISIS and he and each of the children named as Plaintiffs in this Complaint were physically injured in the Brussels Airport Attack.  Melchizedek Martinez suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of the murder of his wife and injuries to himself and each of his children in the Brussels Airport Attack.   Plaintiff Melchizedek Martinez can sue and be sued in this Court.

33.     Plaintiff Kianni Martinez was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kianni Martinez,

all of her siblings and her father were also physically injured in the Brussels Airport Attack. Kianni Martinez suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries, the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Kianni Martinez can sue and be sued in this Court.

34.    Plaintiff Ka.M. was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Ka.M. is a minor born March 7, 20XX who lives with her father and three of her siblings. Plaintiff Ka.M., all of her siblings and her father were physically injured in the Brussels Airport. Ka.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries, the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff Ka.M. can sue and be sued in this Court.

35.    Plaintiff Kimo Martinez was, and at all times relevant hereto, the biological son of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. Plaintiff Kimo Martinez, all of his siblings and his father were physically injured in the Brussels Airport Attack. Kimo Martinez has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of his own injuries, the murder of his mother and injuries to his father and each of his siblings in the Brussels Airport Attack. Plaintiff Kimo Martinez can sue and be sued in this Court.

36.    Plaintiff N.M. was, and at all times relevant hereto, the biological daughter of Gail Martinez and Melchizedek Martinez, and a citizen of the United States. N.M. is a minor born March 16, 20XX who lives with her father and three of her siblings. Plaintiff N.M., all of her siblings and her father were also physically injured in the Brussels Airport Attack. N.M. has suffered physical injuries, severe mental anguish and extreme physical and emotional pain and suffering as a result of her own injuries,

the murder of her mother and the injuries suffered by her father and each of her siblings in the Brussels Airport Attack. Plaintiff N.M. can sue and be sued in this Court.

37.     Plaintiff Rosie T. Martinez was, and at all times relevant hereto, the biological mother of Melchizedek Martinez, and a citizen of the United States. Rosie T. Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her son in the Brussels Airport Attack. Plaintiff Rosie T. Martinez can sue and be sued in this Court.

38.     Plaintiff Maria Luisa Martinez was, and at all times relevant hereto, the biological sister of Melchizedek Martinez, and a citizen of the United States. Maria Luisa Martinez has suffered severe mental anguish and extreme emotional pain and suffering as a result of the injuries to her brother in the Brussels Airport Attack. Plaintiff Maria Luisa Martinez can sue and be sued in this Court.

**The Minglana Plaintiffs**

39.     Plaintiff Angelito Minglana, Sr. was, and at all times relevant hereto, the biological father of Gail Martinez, and a citizen of the United States. Angelito Minglana, Sr. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his daughter in the Brussels Airport Attack. Plaintiff Angelito Minglana, Sr. can sue and be sued in this Court.

40.     Plaintiff Teofista Minglana was, and at all times relevant hereto, the biological mother of Gail Martinez, and a citizen of the United States. Teofista Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her daughter in the Brussels Airport Attack. Plaintiff Teofista Minglana can sue and be sued in this Court.

41.     Plaintiff Gerard Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Gerard Minglana has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Gerard Minglana can sue and be sued in this Court.

42.    Plaintiff Gilda Minglana-Hardwood was, and at all times relevant hereto, the biological sister of Gail Martinez, and a citizen of the United States. Gilda Minglana-Hardwood has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of her sister in the Brussels Airport Attack. Plaintiff Gilda Minglana-Hardwood can sue and be sued in this Court.

43.    Plaintiff Angelito Minglana, Jr. was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelito Minglana, Jr. has suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Angelito Minglana, Jr. can sue and be sued in this Court.

44.    Plaintiff Angelo Minglana was, and at all times relevant hereto, the biological brother of Gail Martinez, and a citizen of the United States. Angelo Minglana suffered severe mental anguish and extreme emotional pain and suffering as a result of the murder of his sister in the Brussels Airport Attack. Plaintiff Angelo Minglana can sue and be sued in this Court.

**The Empey Plaintiffs**

45.    Joseph D. Empey ("Dres") was injured in the Brussels Airport Attack, which was committed by ISIS, a FTO.  At the time of the acts alleged, and at all other times relevant hereto, Joseph D. Empey was a United States citizen. Plaintiff Joseph D. Empey can sue and be sued in this Court.

46.    Plaintiff Amber Orton-Empey was, and at all times relevant hereto, the biological mother of Joseph D. Empey, and a citizen of the United States. Plaintiff Amber Orton-Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Dres, being injured in the Brussels Airport Attack. Plaintiff Amber Orton-Empey can sue and be sued in this Court.

47.    Plaintiff Joseph C. Empey was, and at all times relevant hereto, the biological father of Joseph D. Empey, and a citizen of the United States. Plaintiff Joseph C. Empey suffered severe mental

anguish and extreme emotional pain and suffering as a result of his son, Dres, being injured in the Brussels Airport Attack. Plaintiff Joseph C. Empey can sue and be sued in this Court.

48.     Plaintiff Dorothy Empey was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff Dorothy Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Dres, being injured in the Brussels Airport Attack. Plaintiff Dorothy Empey can sue and be sued in this Court.

49.     Plaintiff Henry Empey was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff Henry Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Dres, being injured in the Brussels Airport Attack. Plaintiff Henry Empey can sue and be sued in this Court.

50.     Plaintiff Isabelle Empey was, and at all times relevant hereto, the biological sister of Joseph D. Empey, and a citizen of the United States. Plaintiff Isabelle Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Dres, being injured in the Brussels Airport Attack. Plaintiff Isabelle Empey can sue and be sued in this Court.

51.     Plaintiff Abraham R. Empey was, and at all times relevant hereto, the biological brother of Joseph D. Empey, and a citizen of the United States. Plaintiff Abraham R. Empey has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Dres, being injured in the Brussels Airport Attack. Plaintiff Abraham R. Empey can sue and be sued in this Court.

**The Norby Plaintiffs**

52.     Richard I. Norby ("Richard") was injured in the Brussels Airport Attack, which was committed by ISIS, a FTO.   At the time of the acts alleged, and at all other times relevant hereto, Richard I. Norby was a United States citizen. Plaintiff Richard I. Norby can sue and be sued in this Court.

53.     Plaintiff Pamela J. Norby was, and at all times relevant hereto, the wife of Richard I. Norby, and a citizen of the United States. Plaintiff Pamela J. Norby has suffered severe mental anguish and extreme emotional pain and suffering as a result of her husband, Richard, being injured in the Brussels Airport Attack. Plaintiff Pamela J. Norby can sue and be sued in this Court.

54.     Plaintiff Tiffany Allred was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Tiffany Allred has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Tiffany Allred can sue and be sued in this Court.

55.     Plaintiff Jason Norby was, and at all times relevant hereto, the son of Richard I. Norby, and a citizen of the United States. Plaintiff Jason Norby suffered severe mental anguish and extreme emotional pain and suffering as a result of his father being injured in the Brussels Airport Attack. Plaintiff Jason Norby can sue and be sued in this Court.

56.     Plaintiff Chelsea Snell was, and at all times relevant hereto, the daughter of Richard I. Norby, and a citizen of the United States. Plaintiff Chelsea Snell has suffered severe mental anguish and extreme emotional pain and suffering as a result of her father being injured in the Brussels Airport Attack. Plaintiff Chelsea Snell can sue and be sued in this Court.

**The Wells Plaintiffs**

57.     Mason Wells ("Mason") was injured in the Brussels Airport Attack, which was committed by ISIS, a FTO.   At the time of the acts alleged, and at all other times relevant hereto, Mason Wells was a United States citizen. Plaintiff Mason Wells can sue and be sued in this Court.

58.     Plaintiff Chad S. Wells was, and at all times relevant hereto, the biological father of Mason Wells, and a citizen of the United States. Plaintiff Chad S. Wells has suffered severe mental

anguish and extreme emotional pain and suffering as a result of his son, Mason, being injured in the Brussels Airport Attack. Plaintiff Chad S. Wells can sue and be sued in this Court.

59.    Plaintiff Kymberly E. Wells was, and at all times relevant hereto, the biological mother of Mason Wells, and a citizen of the United States. Plaintiff Kymberly E. Wells suffered severe mental anguish and extreme emotional pain and suffering as a result of her son, Mason, being injured in the Brussels Airport Attack. Plaintiff Kymberly E. Wells can sue and be sued in this Court.

60.    Plaintiff Porter J. Wells was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff Porter J. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Porter J. Wells can sue and be sued in this Court.

61.    Plaintiff Mia Wells was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff Mia Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Mia Wells can sue and be sued in this Court.

62.    Plaintiff T.W. was, and at all times relevant hereto, the biological sister of Mason Wells, and a citizen of the United States. Plaintiff T.W. is a minor born August 28, 20XX who lives with her mother, father and siblings. Plaintiff T.W. has suffered severe mental anguish and extreme emotional pain and suffering as a result of her brother, Mason, being injured in the Brussels Airport Attack. Plaintiff T.W. can sue and be sued in this Court.

63.    Plaintiff Colby S. Wells was, and at all times relevant hereto, the biological brother of Mason Wells, and a citizen of the United States. Plaintiff Colby S. Wells has suffered severe mental anguish and extreme emotional pain and suffering as a result of his brother, Mason, being injured in the Brussels Airport Attack. Plaintiff Colby S. Wells can sue and be sued in this Court.

## THE DEFENDANTS

64.     **Lafarge:** Defendant LaFarge S.A. was the parent company of multinational building materials subsidiary businesses and was organized under the laws of France and headquartered in Paris, France. Lafarge, together with its direct and indirect subsidiaries, employed 63,000 people to manufacture and sell cement, construction aggregates, concrete and other building materials at 1,612 production sites in approximately 61 countries, including the United States. Lafarge oversaw and directed the conduct of LafargeCyprus and LCS, two subsidiaries that it wholly controlled. LCS made agreements and transactions with ISIS and ANF at the direction of Lafarge's and LCS's senior management. Lafarge executives were informed in detail of LCS's decisions and themselves gave directions to support doing business with the FTOs. As Christian Herrault, Executive Vice President of Operations at Lafarge, wrote in 2017, which was years after the Lafarge Defendants become part of the Holcim Defendants, LCS's "local concessions" to terrorists "were made with the clear and repeated approval" of senior Lafarge leadership. Thus, when allegations below refer to LCS or LCS employees, the described conduct occurred at Lafarge's direction and for Lafarge's benefit.

65.     **Lafarge Cyprus:** Defendant Lafarge Cement Holding Limited is or was a direct subsidiary of Lafarge and is now believed to be part of the Holcim Group of Defendants. It is or was organized under the laws of Cyprus and headquartered in Cyprus. Lafarge Cyprus was the entity through which Lafarge held nearly all of its shares in LCS and through which Lafarge often routed money to LCS and intermediaries, including through international bank transfers that went through New York, and thereby financed Lafarge's payments to ISIS. Lafarge Cyprus's financing of LCS's transfers was done knowingly, at Lafarge's direction, and with Lafarge's approval until Lafarge and its subsidiaries merged with and/or was acquired by Holcim in 2015, which has alternately been known as LafargeHolcim, Holcim AG, Holcim LTD, Holcim US, Holcim North America and has announced that in 2025 it will

spin off its US operations to become known as Ampize. In 2014, Lafarge Cyprus executed a consulting agreement with Firas Tlass[1] to conceal the Lafarge Defendants' payments to ISIS.

66.    **LCS:** Defendant Lafarge Cement Syria S.A. was an indirect subsidiary of Lafarge organized under the laws of Syria and headquartered in Damascus, Syria. Lafarge indirectly owned approximately 98.7% of LCS's issued and outstanding share capital through four separate subsidiaries. From approximately May 2010 to September 2014, Lafarge, through LCS, operated a cement plant in the Jalabiyeh region of Syria, located in Northern Syria near the Turkish border and between the cities of Manbij and Raqqah, Syria (the "Jalabiyeh Cement Plant").

67.    On July 10, 2015, after the offense conduct described herein had ended, Lafarge was acquired by its leading competitor, Holcim. Lafarge is believed to have thereafter became a wholly owned subsidiary of or otherwise merged into the Holcim Defendants.  Upon information and belief, it is alleged that the Holcim Defendants became legally responsible and fully liable for the debts, obligations and conduct of its acquired entities, the Lafarge Defendants. By way of the merger, the Holcim Defendants are successors in interest to the Lafarge Defendants.

68.    **Holcim:** Defendant Holcim Ltd (a/k/a Holcim AG) operates in the U.S. through several wholly-owned subsidiaries, including: Holcim US Inc. – A major U.S. construction materials and cement provider; Aggregate Industries US; and Lafarge North America Inc.  These entities are incorporated in and operate throughout the U.S. and are direct subsidiaries of Holcim.

69.    **Holcim US:** Defendant Holcim (US) Inc. is the US operational subsidiary, agent and alter ego of Holcim. Holcim US includes close to 350 sites in 43 states and employs 7,000 people. Defendant

---

[1] Firas Tlass is a Syrian businessman and the son of former Syrian defense minister Mustafa Tlass.  He was a minority shareholder of Lafarge and upon information and belief, maintained close relationships with the Assad regime.

Holcim US for the benefit of all of its affiliate Holcim Defendants and Lafarge Defendants did business in various jurisdictions throughout the United States, including in this District, where it can sue and be sued.

## JURISDICTION AND VENUE

70.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, 18 U.S.C. § 2333, and 18 U.S.C. § 2338, as a civil action brought by nationals of the United States who were killed or injured by reason of acts of international terrorism, and their estates, survivors, and heirs.

71.     Defendants are subject to personal jurisdiction, pursuant to 18 U.S.C. § 2334(a), New York Civil Practice Law and Rules § 302(1), and Federal Rule of Civil Procedure 4(k)(1)(A), because, as discussed further, below they have transacted business and committed tortious acts within the United States (and New York) by engaging in U.S. dollar-denominated transactions processed through New York banks for the benefit of the FTO ISIS. Personal jurisdiction also exists under Federal Rule of Civil Procedure 4(k)(2) because Defendants' executives regularly used personal email accounts serviced by U.S.-based email service providers, instead of their corporate email addresses, to coordinate and carry out elements of their conspiracy with ISIS, while attempting to conceal their conduct from auditors and authorities.

72.     Personal jurisdiction also exists under Federal Rule of Civil Procedure 4(k)(2) because Defendants participated in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States, including the killing of Americans.

73.     Defendants are also subject to personal jurisdiction given their participation in a conspiracy with ISIS, whose actions were at all relevant times directed at the United States, including the killing of Americans.

**FACTUAL ALLEGATIONS**

I.    **DEFENDANTS AIDED ISIS AND OTHER TERROR GROUPS TARGETING THE UNITED STATES**

74.    On October 18, 2022, the Lafarge Defendants, with the knowledge and involvement of the Holcim Defendants, plead guilty to conspiring to provide material support and resources to ISIS. and the al-Nusra Front ("ANF"). *USA v. Lafarge S.A. et al.,* 22-cr-00444-WFK (2022) (EDNY).

75.    The facts to which the Lafarge Defendants have admitted are detailed in the Information (D.E. 4) and Statement of Facts and as set forth in summary below.

76.    In 2007, Lafarge purchased the Jalabiyah Cement Plant as part of a deal with Egyptian cement multinational Orascom Cement. In 2010, Lafarge and LCS completed the construction of the Jalabiyah Cement Plant at a cost of $680 million. When the Jalabiyah Cement Plant finally opened for business in May 2010, Lafarge's CEO Bruno Lafont toured the facility with reporters and the French Ambassador to Syria. Shortly thereafter, the plant began producing 160 truckloads of cement a day, amounting to half a million dollars' worth of daily sales.

77.    At the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey. To address this issue, in December 2010, Bruno Pescheux (LCS's CEO) requested that then-minority shareholder Tlass, a Syrian citizen with close connections to the Syrian regime and local groups, intervene with the Syrian government to curtail imports of competing Turkish cement.

78.    In or about 2011, after a civil war began in Syria, with the knowledge and approval of Lafarge, LCS conspired to engage in transactions, through intermediaries, with numerous armed factions present in the region of the Jalabiyeh Cement Plant, ultimately including the U.S.-designated foreign terrorist organizations ISIS and ANF. In response to this crisis, in September 2011, the European Union barred its member states from buying, importing, and/or transporting oil and other petroleum products

from Syria and from engaging in financial or insurance services for such transactions. The United States forbade import of its products into Syria, embargoed Syrian oil, and froze the assets of several Syrian individuals. In December 2011, the U.N. Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

79.     As the civil war continued, ISIS and ANF gained control over large swaths of Syria and committed brutal terrorist acts. As expected, the danger of operating in an active warzone, combined with the actions of the European Union, the United Nations, and the United States, prompted a mass exodus of multinational corporations from Syria. For example, in December 2011, two of the largest oil companies in the world—Royal Dutch Shell and Total—announced that they were leaving Syria.

80.     While other multinational corporations ceased operations in Syria, Lafarge and LCS executives saw an opportunity to partner with the terrorists and consequently, through intermediaries, negotiated agreements to pay armed terrorist groups for the protection of LCS employees, to ensure continued operation of the Jalabiyeh Cement Plant, to maintain economic presence in the Syrian cement market and to leverage the terrorist relationships to illegally hinder competitors that remained operational in the region.

81.     Lafarge and LCS executives conspired to make periodic security payments to armed groups, including ISIS and ANF, and to purchase raw materials from ISIS-controlled suppliers who paid ISIS based on the amount of their sales to LCS.  Moreover, for the explicit purpose of incentivizing ISIS to act in a manner that would promote Lafarge's and LCS's security, competitive and economic interests, Lafarge and LCS conspired to make payments to ISIS based on the volume of cement that LCS sold—effectively a revenue-sharing agreement that Lafarge and LCS executives likened to paying "taxes" to ISIS. In exchange, ISIS permitted access to raw materials sourced from territory under its control so that the Jalabiyeh Cement Plant could continue to produce cement, and further allowed LCS employees,

suppliers and customer-distributors to safely pass through ISIS and ANF checkpoints on the roads leading to the Jalabiyeh Cement Plant. ISIS also agreed to impose costs on, and in some cases block the importation of, competing cement from Turkey. Had Lafarge and LCS refused to deal with ISIS and ANF, LCS would not have been able to acquire the raw materials needed to operate the Jalabiyeh Cement Plant and produce cement, and ISIS and ANF would have used force and threats of force to prevent LCS's employees and customers from traveling there to do their jobs and purchase the cement that LCS had produced.

82.    LCS engaged in this conduct at the direction of Lafarge's and LCS's senior management for the specific purpose of protecting Lafarge's and LCS's employees, assets, and future economic opportunities in Syria. As one Lafarge executive wrote in an August 27, 2017 response to his August 25, 2017, termination from Lafarge, which occurred almost two years after Lafarge became a part of Holcim, "All the local concessions that I had to make to this end were made with the clear and repeated approval of my hierarchy, regarding the details as well as the principle…. Nothing I did was unknown to my hierarchy who methodically approved my initiatives, including all the details, and was satisfied about them."[2]

83.    Lafarge and LCS completed the construction of the Jalabiyeh Cement Plant in 2010 at a cost of approximately $680 million. Lafarge and LCS executives believed that keeping the Jalabiyeh Cement Plant in business and sharing the proceeds with the armed groups in control of the surrounding areas, including ISIS and ANF, was the best way to protect employees, to safeguard the asset from looting and destruction during the Syrian Civil War, and to enable Lafarge and LCS to benefit from the

---

[2] All citations to documents originally in English contain original spelling, punctuation, and grammar. Citations to documents originally in French are based on translations.

economic opportunity presented by the need to rebuild Syria following the cessation of hostilities. Neither Lafarge nor LCS made payments to ISIS or ANF because they supported the terrorist organizations' ideology or methods.

84.    Lafarge and LCS have admitted that, starting in the summer of 2012, they forged ahead with their plan to make financial payments to various terrorist groups. On September 23, 2012, Lafarge's VP of Security Jean-Claude Veillard and Firas Tlass met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the Jalabiyeh Cement Plant. Tlass recommended that LCS make payments to each of the armed militias based on the quantity of cement produced or according to a monthly fee.

85.    Lafarge and LCS have admitted to providing almost $10 million of value in funds and cement to ISIS and ANF from August 2013 to October 2014, and of this at least $7.21 million was directly to ISIS and ISIS-controlled entities. But the actual amount of funding that Defendants gave to armed groups is believed to be at least $15.5 million, even excluding the value of the cement Defendants left for ISIS.

### A.    ISIS

87.    On or about October 15, 2004, the United States Secretary of State designated al- Qaeda in Iraq ("AQI"), then known as Jam'at al Tawhid Wa'al-Jihad, as a Foreign Terrorist Organization ("FTO") under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive order 13224. On or about May 15, 2014, the Secretary of State amended the designation of AQI as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224 to add the alias Islamic State of Iraq and the Levant ("ISIL") as its primary name. The Secretary of State also added the following aliases to the FTO listing: The Islamic State of Iraq and al-Sham ("ISIS," which

is how the FTO will be referenced herein),The Islamic State of Iraq and Syria, ad-Dawla al-Islamiyya fi al-Iraq wa-sh-Sham, Daesh, Dawla al Islamiya, and Al-Furquan Establishment for Media Production. On September 21, 2015, the Secretary added the following aliases to the FTO listing: Islamic State, ISIL and ISIS. To date, ISIS has remained a designated FTO. ISIS has claimed credit for numerous terrorist activities.

88.    Defendants proceeded to make millions of dollars in payments and provide key materials to ISIS, even as the group's terror campaign reached its peak. Lafarge and LCS have admitted that they began making payments to ISIS's predecessor groups in July 2012, and payments directly to ISIS itself when ISIS entered the territory near the Jalabiyeh Cement Plant in 2013.

89.    As early as July 2012, when armed groups started taking over territory around the Jalabiyeh Cement Plant, LCS began making fixed monthly payments or "donations" to armed groups to ensure that the plant could continue to operate. By November 2013, Lafarge and LCS executives explicitly confirmed that these donations were being made directly to ISIS. Ultimately, according to Lafarge and LCS's plea, these payments exceeded $816,000 in monthly "donations" to ISIS and ANF. Of this, approximately $585,000 went directly to ISIS.

90.    In a November 29, 2013 email, Lafarge and LCS executives exchanged a list of "donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries." The email contained a "List valid from November 1, 2013," which included a monthly payment of five million Syrian pounds ($38,000) for "Daesh (ISIS)." The list showed that the monthly donation payments to all armed groups now totaled 24 million Syrian pounds ($174,000).

91.    These monthly donations were facilitated by Tlass, who acted as an intermediary between Defendants and the various armed groups in the area, including ISIS. From July 2012, Tlass was receiving between $80,000 and $100,000 per month to distribute to these groups. In an August 5, 2013

24

email with the subject line "Update on donations," Pescheux wrote to Herrault about "some elements on the donations we are paying to [Tlass] and that he is supposed to channel to the various beneficiaries. As discussed in Dubai end of May and as reminded in my recent mail to you and [Roux], these donations are distinct from the monthly remuneration of our partner" Tlass.

92.    The Lafarge Defendants, now part of the Holcim Defendants, provided support to ISIS primarily through six mechanisms:

a)    monthly fixed-rate payments;

b)    a flat fee payment per cement truck travelling back and forth from the Jalabiyeh Cement Plant;

c)    "bonus" payments based on the amount of cement sold;

d)    payments to ISIS-controlled suppliers for raw materials LCS used to make cement;

e)    benefits and payments based on a long-term revenue-sharing agreement; and

f)    selling and leaving behind cement and raw materials for ISIS to use in its operations.

93.    These payments to ISIS violated 18 U.S.C. § 2339B, the United Kingdom Terrorism Act, § 15 (2000), European Union Council Framework Decision 2002/475/JHA (2002), and French Criminal Code Article 421-2-2 (2001).

94.    Lafarge and LCS executives actively attempted to conceal their conduct from others within and outside Lafarge and LCS, including by using third-party intermediaries to carry out negotiations and effect these agreements with ISIS, and by attempting to require ISIS not to include the name "Lafarge" on the documents memorializing and implementing their agreements.  Many of the Lafarge and LCS executives involved in the offense conduct also used personal email accounts serviced by U.S.-based email service providers, instead of their Lafarge corporate email addresses, to carry out some aspects of the conspiracy.  Lafarge and LCS executives also created invoices with false descriptions

for the third-party intermediaries they used to negotiate with ISIS, in order to conceal the nature of the work that the intermediaries had performed for Lafarge and LCS, and to allow Lafarge and LCS to later falsely deny knowledge of their activities.

**B.    Al-Nusrah Front**

95.    By November 2012, Lafarge and LCS executives had approved a plan to establish relations with ANF, another Al-Qaeda offshoot, through Tlass. On November 11, 2012, Tlass notified Pescheux that LCS was engaging directly with ANF: "gazi entab [Gaziantep, Turkey] was good we hav now conextion with jabhat al nosra [ANF]." Lafarge and LCS executives were fully aware at the time that they were dealing with terrorist organizations. For example, in a December 10, 2012 email, Veillard wrote: "The Islamist group Jabhat Al-Nusra, which is on USA's list of terrorist organisations, has reportedly recruited several Norwegian citizens to fight in Syria."

96.    On December 11, 2012, the Secretary of State amended the 2004 designation of AQI to include the following aliases: al-Nusrah Front ("ANF"), Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, and Al-Nusrah Front for the People of the Levant.

97.    The situation became more critical in 2013. By February 2013, at Pescheux's request, Tlass had begun periodically providing lists identifying the armed groups to which he was making payments on Defendants' behalf and the amounts he was paying to the groups each month. For instance, Tlass advised Pescheux that he was making monthly payments of 200,000 Syrian pounds at first, and later 325,000 Syrian pounds per month to a group he identified as the "ALRAQA People," a reference to ANF. And the amounts kept increasing. By March 2013, armed groups had taken over the area around Raqqa and quickly established checkpoints at access roads to the Cement Plant. In a March 1, 2013 email, LCS's risk manager warned Pescheux that ANF "follow[s] a global jihadi ideology (similar to al-Qaida)," "are more open to receive foreign fighters," and had "ties to al-Qaeda, exemplified by

participating al-Qaida veterans" and the fact that "some of their statements are quickly published in the main al-Qaida news outlet."

98.    On April 7, 2013, Tlass recommended that LCS executives negotiate a new agreement to pay terrorist groups monthly or by the truckload to ensure continued sales and access to the plant.

99.    In a July 2, 2013 email with the subject line "Donations," Pescheux calculated that the new total of monthly payments to armed factions was 17.4 million Syrian pounds ($155,000 USD) per month. Several months later, on August 30, 2013, Pescheux reported to Veillard and Herrault: "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Tlass] to work on it." Notes from a September 11, 2013 meeting of Lafarge's Security Committee, which Veillard and Herrault received, stated: "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the U.S. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate." Despite this knowledge, Defendants decided to dispense with any limits and instead to conspire with the terrorists and facilitate their crimes.

100.    On May 15, 2014, the Secretary of State, in response to the evolving nature of the relationship between ANF and AQI, amended the FTO designation of AQI to remove all aliases associated with al-Nusrah Front. Separately, the Secretary of State then designated al-Nusrah Front, also known as Jabhat al-Nusrah, Jabhet al-Nusra, The Victory Front, Al-Nusrah Front for the People of the Levant, Al-Nusrah Front in Lebanon, Support Front for the People of the Levant, and Jabaht al-Nusra li-Ahl al-Sham min Mujahedi al-Sham fi Sahat al-Jihad, as an FTO under Section 219 of the Immigration and Nationality Act and as a Specially Designated Global Terrorist entity under section 1(b) of Executive Order 13224. To date, ANF has remained a designated FTO.

101.    From in or around August 2013, or earlier, through October 2014, Lafarge and LCS conspired to make various payments, through intermediaries, to and for the benefit of ISIS and ANF, which the government estimates totaled the equivalent of approximately $5.92 million. These payments consisted, at various times, of flat monthly "donation" payments totaling approximately $816,000, payments to ISIS-controlled suppliers to purchase raw materials needed to produce cement that totaled approximately $3,447,528, and variable payments based on the amount of cement LCS sold that totaled approximately $1,654,466. When LCS eventually evacuated the Jalabiyeh Cement Plant in September 2014, ISIS stole cement that LCS had produced in furtherance of the conspiracy, and ISIS sold the cement at prices that would have yielded ISIS approximately $3.21 million. In addition, Lafarge and LCS conspired to pay the equivalent of approximately $1,113,324 to third-party intermediaries for negotiating with and making payments to ISIS and ANF on Lafarge's and LCS's behalf. Defendants referred to their "profit" as a "cake," and stated they were happy to "share" a slice with ISIS so long as ISIS continued to protect and enhance Defendants' interests.

102.    It is estimated that during the time period from August 2013 to October 2014, LCS obtained the equivalent of approximately $70,295,820 in total sales revenue through its participation in the conspiracy, and the gross gains to all participants in the conspiracy, including LCS, the intermediaries, ISIS and ANF, totaled approximately $80,541,890.

## II.    THE SCHEME TO PROVIDE MATERIAL SUPPORT TO FOREIGN TERRORIST ORGANIZATIONS

### A.    Lafarge and LCS Use Intermediaries to Begin Negotiations with Armed Groups

103.    Lafarge and LCS constructed the Jalabiyeh Cement Plant in northern Syria at a cost of approximately $680 million. Through LCS, Lafarge began manufacturing cement at the Jalabiyeh Cement Plant in May 2010. From the beginning of LCS's operations, it faced strong competition from cheaper cement imported into northern Syria from Turkey, and in December 2010, Lafarge executives

sought the assistance of intermediaries to intervene with the Syrian government to control the importation of competing Turkish cement.

104.    In or around 2011, the combination of civil protests in Syria and the Syrian government's violent suppression of those protests developed into a full-fledged civil war, which remains ongoing.  In or about September 2011, the European Union ("EU") imposed an embargo on Syrian petroleum products to further isolate and weaken the Syrian regime in response to its brutal crackdown on opposition groups within the country.  Under the new sanctions, all 27 EU member states were barred from buying, importing or transporting oil and other petroleum products from Syria, and from entering into financial or insurance services for such transactions. On or about December 1, 2011, the United Nations Office of the High Commissioner for Human Rights declared that Syria was in a state of civil war.

105.    In 2012, ISIS and ANF gained control of territory in Syria and committed numerous terrorist acts, resulting in the deaths of numerous U.S. citizens, among others.

106.    The EU sanctions and U.N.'s recognition of the Syrian civil war were followed by an exodus of multinational corporations from Syria.  For example, on December 2, 2011, a Dutch petroleum conglomerate announced that it was pulling out from Syria in response to the sanctions. Three days later, one of the world's largest oil companies, headquartered in France, announced that it was halting operations in Syria due to, among other factors, safety concerns.  Other international corporations quickly followed suit.

107.    By contrast, Lafarge and LCS executives took action to preserve ongoing operations at the Jalabiyeh Cement Plant.  By May 2012, the conflict had spread to areas immediately surrounding the Jalabiyeh Cement Plant.  Some LCS employees were kidnapped for ransom, one LCS contractor was killed at a checkpoint, and armed militants began to regularly hijack LCS trucks.  Lafarge and LCS

executives were aware of the risks of violence to their personnel and suppliers. In a June 1, 2012 email, one executive wrote, "Both the threat level together with the volatility of the situation have led…… to make the decision to diminish our exposure and more specifically of the expatriates population who can become targets. What is expected is to proceed to an orderly evacuation of the expatriate employees, but ensuring the physical protection of the assets and equipment being mothballed at every step." Thus, in June 2012, LCS's European employees were evacuated from the country, and LCS's non-Syrian management relocated from its headquarters in Damascus, Syria, to the offices of a Lafarge Group company in Cairo, Egypt. LCS's Syrian employees, however, continued to operate the Jalabiyeh Cement Plant under the direction of LCS's management from Cairo.

108.    Starting in the summer of 2012, Lafarge and LCS executives, through intermediaries, began to negotiate with various armed factions in the Syrian civil war to permit continued operations of the Jalabiyeh Cement Plant. On September 23, 2012, Lafarge executives met in Gaziantep, Turkey with representatives of armed militants in areas surrounding the plant. Thereafter, it was recommended that LCS make payments to each of the armed groups based on the quantity of cement produced at the plant or according to a monthly fee.

109.    By November 2012, ANF's presence in the region surrounding the Jalabiyeh Cement Plant grew, and Lafarge and LCS executives approved a plan to establish relations with ANF.

**B.    Lafarge and LCS Begin Making Payments to Terrorists**

110.     Lafarge and LCS pursued this course of action even as ISIS's and ANF's influence in the areas surrounding and serviced by the Jalabiyeh Cement Plant began to grow. By March 2013, the city of Raqqah, located less than a two-hour drive from the Jalabiyeh Cement Plant, had fallen to ISIS and ANF, among other armed groups. Both jihadist groups quickly established armed checkpoints at roads accessing the Jalabiyeh Cement Plant. Shortly thereafter, on or about April 7, 2013, it was

recommended that LCS executives negotiate an agreement to pay ANF monthly or by the truck to ensure continued access to the plant.  On or about June 25, 2013, LCS's risk manager wrote to Lafarge executives that ISIS was gathering strength near the Jalabiyeh Cement Plant.  In an email on or about July 24, 2013, LCS's risk manager warned that ISIS and ANF had erected checkpoints at the "Sarreen intersection" an approximately 30-minute drive from the Jalabiyeh Cement Plant, "and at the grain silos," with snipers on the silos, as well as homemade artillery and rockets.

111.    In an August 30, 2013 email, Lafarge executives acknowledged that, "It is clear that we have an issue with ISIS and Al Nusra and we have asked our partner [Intermediary 1] to work on it."

112.    Lafarge and LCS executives identified the "main challenge" related to the presence of ISIS and ANF, among other armed groups, in notes of a September 11, 2013 meeting of Lafarge's Security Committee, "It gets harder and harder to operate without having to directly or indirectly negotiate with networks classified as terrorists by international organizations and the US. The main challenge being to assess how far their demands and threats will reach, and consequently, the limits that we want to impose for the site to operate."

113.    Lafarge and LCS executives took measures to ensure that documents regarding payments to FTOs and other armed groups did not reference the word "Lafarge."  For example, on or about September 16, 2013, a Lafarge executive wrote concerning an agreement with an armed  militia to issue vehicle passes allowing LCS employees, suppliers, and customer-distributors to pass checkpoints west of the Jalabiyeh Cement Plant that "the name of Lafarge should never appear for obvious reasons in any document of this nature.  Please use the words Cement Plant if you need but never the one of Lafarge."

114.    By the summer of 2013, Lafarge and LCS could not continue to operate in Syria without negotiating and ultimately making payments to ISIS, ANF and other armed militants.  For example,

minutes from a Security Committee meeting held in Paris in September 2013, indicate that "logistics flows and staff movements are disrupted, even sometimes blocked . . . by ISIS . . . [which] demand[s] that 'a tax be paid' . . . [a Lafarge executive and an LCS employee] have been 'summoned' in front of the Islamic Court of Raqqa by ISIS in order to answer the charges filed against them: cooperation with the Syrian regime, vandalism against the roads, ethnic favoritism . . . The presence of these Islamist groups is for us the main threat." Despite recognizing the danger, Lafarge and LCS continued to operate in Syria.

115.    Initially, once passage agreements were reached in October of 2013, payments began as a flat $150 fee per cement truck, but soon evolved into payments based on the quantity of cement that LCS sold. To ensure that Lafarge and LCS employees did not make the payments directly to ISIS and ANF, Lafarge and LCS agreed to discount the price of the cement sold to their customer-distributors to reimburse them for making the payments to ISIS and ANF themselves. Through intermediaries, Lafarge and LCS agreed to regularly provide ISIS with details regarding the amount of cement sold to each of their customer-distributors so that ISIS could ensure that they had paid the agreed-upon amount.

116.    For example, on or about September 1, 2013, a Lafarge executive sent an intermediary an internal LCS email detailing the seizure of two trucks from an LCS customer-distributor at a checkpoint to the east of the Jalabiyeh Cement Plant. Executive 3 asked, "Can you update me of any progress in your discussions to let trucks (cement as well as raw materials) arriving and leaving on the east side of the plant?" Intermediary 1 replied the next day that his associate had made a call and had been told "that the Truck Sponsors will solve this problem / The Road Situation is better now Al Nusra do not obstruct Lafarge trucks ever as long as we pay them for Saryeen." And, on or about October 14, 2013, an LCS risk manager reported to a Lafarge executive that "our customer has reached long term agreements with leading groups Islamic State in Iraq and al-Sham (ISIS) in Raqqa, the agreement let the trucks coming back and forth from the east side of the plant. Each cement truck has to pay $150."

117.    One agreement obtained by the government from weeks later, however, reflects that LCS agreed to pay ISIS based on the amount of cement that it sold.  This agreement, dated November 6, 2013 and on ISIS letterhead, was between ISIS and LCS.  It provided that ISIS would assess trucks 400 Syrian pounds[4] for each transported ton of cement and, in exchange, ISIS would ensure the safety and free access of the trucks to the cement plant.  Relatedly, an ISIS vehicle pass dated April 26, 2014, and bearing ISIS's letterhead and stamp, allowed LCS employees "to pass through after the required work. This is after they have fulfilled their dues to us.":

---

[4] At this time, the exchange rate of Syrian pounds to U.S. dollars was approximately 112 to 1.



118.    LCS also made fixed monthly "donation" payments through intermediaries to ANF, ISIS and other armed groups with influence over the areas surrounding the Jalabiyeh Cement Plant.

119.    LCS began to make fixed monthly payments to armed groups through an intermediary as early as July 2012.

120.    Not until the summer of 2013, when ISIS began to seize control of Raqqah from ANF and other rebel factions operating from the city, did LCS executives press their intermediary to more specifically identify the recipients of the payments he made to armed groups on LCS's behalf.

121.    On or about July 1, 2013, a Lafarge executive sent the intermediary an email in which he requested "an updated list from the one given in Dubai as we need to better understand some items like 'Bridge check point' or 'Al Raqah people'. To which faction do they belong to?"  In reply, Intermediary 1 provided information identifying some of the armed factions, but not the "Al Raqqah People." In a follow-up email on or about July 2, 2013, with the subject line "Donations," the executive calculated that the new total of monthly payments to armed factions was 17.4 million Syrian Pounds, and he reiterated his request for information about the identities of the armed factions that LCS was paying through the intermediary:

> I have updated in bold characters the list with the clarifications you sent in your memo and the modifications we agreed yesterday.
>
> Can you clarify who are the people of "Euphrates bridge check point" and which check point for "Syrian army check point"? Who are the people in Tal Abyad and Raqah?
>
> I understand that you are dealing with a lot of different people and I have no problem with that but, as the amount has jumped from 7.6 in May to 14.3 in June and 17.4 in July, it is not abnormal to have some clarifications.

122.    LCS's decision to cease payments to the "Al Raqqah people" while paying the local revolutionary council in Manbij permitted LCS to sell cement on the west side of the Jalabiyeh Cement Plant but closed its access to customers and suppliers in the areas to the south and east of the plant.

123.     Indeed, ISIS fighters in Manbij, to the west, permitted cement trucks to travel to and from the Jalabiyeh Cement Plant, even as the roads to Raqqah remained closed.  On August 24, 2013, an LCS employee responsible for dispatching cement trucks provided LCS's risk manager with a photograph of a handwritten Arabic-language document that he had found with one of the drivers.  The document, titled "The Islamic State of Iraq and al-Sham," authorized four named drivers for two named "owners of trucks, to transport four trucks of bagged fixed cement, from the Islamic State checkpoints for only <u>one time</u>."  The letter was signed and dated August 22, 2013, and bore an ISIS-flag stamp with the Arabic text "The Islamic State of Iraq and al-Sham Aleppo Province The Emir of Manbij area and its surroundings."

124.     On or about August 26, 2013, a Lafarge executive emailed the intermediary a map of the area around the plant and summarized the "strong improvement" "[o]n the west side of the plant towards Menbij, Al Bab, Aleppo, Idlib" but highlighted that "[o]n the east side of the plant towards Hassakeh and Qamishli. There are 2 check points held by jihadists (see the map) which are blocking the trucks to go to and from the plants," and "[o]n the south of the plant, in the region of Al Thawra, Raqqah, Sokhna: there is a check point held by jihadists between Al Thawra and Raqqah and also potential problems at Sokhna."  He summarized the problem by stating "[g]enerally speaking, it is clear we have an issue with ISIS and Al Nusra in the east, especially in Raqqah."  The intermediary responded "no probleme let me work on it today . . . i cal u tomorow to breef you."  The next day the intermediary emailed the executive to advise him that "We Negotiate with (DAWLET AL IRAQ WAL SHAM) AL ISLAMIA & AL NUSRA I got a News that the situation In the Plant is Very Good."

125.     By November 2013, Lafarge and LCS executives had agreed that the intermediary should make fixed monthly security payments to ISIS.  In a November 29, 2013 email, a list of donations was sent detailing the payments to the intermediary that he was supposed to channel to the various

beneficiaries.  The email contained a "List valid from November 1, 2013" that included a 5,000,000 Syrian Pound monthly payment for "Daesh (ISIS)."  The Executive further indicated that the monthly donation payments to all armed groups now totaled 24 million Syrian Pounds.

126.    On February 4, 2014, Lafarge executives directed the intermediary to limit the monthly payments to armed groups to 20 million Syrian Pounds, including limiting assessments on sales to 200 Syrian pounds per ton.  Intermediary 1 responded that his representatives were meeting with ISIS representatives ("daiich") in Raqqah and in Aleppo with ANF ("al nusra") regarding the payments.

127.    Payments to armed militants allowed LCS to continue producing and selling cement at the Jalabiyeh Cement Plant through the spring of 2014.

128.    The Jalabiyeh Cement Plant was in Raqqa, one of the first cities to fall to opposition groups during Syria's civil war. ISIS's Raqqa Cell attained prominence within ISIS itself because of its central location and the large population under its control. It became critical to planning ISIS's outward reach, and ISIS leadership flocked there. While ISIS was founded and led by Al- Baghdadi in Iraq, its expansionary military strategy and much of its operations and planning worldwide were centered in Raqqa. Al-Baghdadi declared that Raqqa would be the seat of his state, due to its proximity to both Iraq and Syria. According to LCS's former risk manager, Lafarge negotiated with ISIS's representatives in Raqqa.

129.    As the capital, ISIS's leadership and strategy were set in Raqqa. Secretary of State John Kerry stated in 2015 that Raqqa was "the core where they're [ISIS] planning" attacks. A Pentagon spokesperson likewise confirmed that ISIS's militant administration and leadership were based in Raqqa. As described by the Commander of U.S. Central Command, Raqqa was "where [ISIS's] plotting takes place Raqqa is recognized as the financial, leadership and external ops center of the Islamic State." And

indeed, the Pentagon has explicitly stated that "Raqqa was a key location for ISIS' planning, financing, execution, or inspiration of terrorist activities throughout the world, including" the Bataclan Attacks.

130.    ISIS's Raqqa Cell was led by Abu Luqman, also known as Ali Musa Al-Shawakh, from early 2014 until his death in an airstrike in 2018. Abu Luqman had been a powerful ANF terrorist but then switched his allegiance to ISIS and recruited several hundred ANF fighters to join ISIS's ranks in Raqqa. He served on ISIS's Leadership Cell, as well as on ISIS's Intelligence Cell. Abu Luqman was head of ISIS's Directorate of General Security, which was responsible for intelligence gathering, detentions, state security, and external intelligence. Public reports state that Abu Luqman served on a "shadow board" of the Jalabiyeh Cement Plant. Abu Luqman also controlled ISIS's oil sales in northern Syria, which likely included sales of fuel to LCS.

131.    In December 2014, Abu Luqman himself was present, alongside Lafarge's agent Amro Taleb, to facilitate ISIS's purchase of remaining materials in Lafarge's factory, worth $11.5 million. The next month, less than a year before the Bataclan Attack, at Defendants' expense, Taleb visited Lafarge's headquarters in Paris to report on the ongoing negotiations with Abu Luqman to re-open the plant under Lafarge's supervision.

132.    The Raqqa Cell and Abu Luqman not only coordinated with Defendants or their agents and directly received their material support, but directly participated in the acts of international terrorism that injured Plaintiffs.

133.    As the de facto capital, Raqqa was the center of ISIS's training and planning. Indeed, the Raqqa Cell served as a nerve center for ISIS operations worldwide. Raqqa was "where ISIS plans their external operations," stated the commander of U.S. Central Command. Abu Luqman and the Raqqa leadership therefore participated in the expansion of ISIS's territory beyond Iraq and Syria. The Raqqa Cell was critical to determining when and how to recruit or accept additional members, where to expand,

and how to commit attacks outside Raqqa by (1) serving as the bridge between ISIS's Leadership Cell and local cells on the ground in other locations; (2) maintaining ISIS propaganda network, which instructed, inspired, and motivated the attacks; and (3) supplying logistical, training, and financial support for ISIS's external attacks.

### III.    LCS Purchases Raw Materials and Supplies from ISIS-Controlled Suppliers

134.    In or about late 2013, after ISIS expanded its control over the region, including quarries necessary for the production of cement, LCS began to purchase from suppliers within those territories raw materials and supplies to allow the continued production of cement.  A written agreement on ISIS letterhead dated November 6, 2013, provided that LCS would purchase pozzolana—a type of volcanic ash used to create blended cement—from ISIS for 1,300 Syrian pounds per ton.  The agreement, negotiated by an associate working for intermediaries, provided that ISIS would allow LCS's suppliers who mined and transported the pozzolana from ISIS- controlled quarries near Raqqah to retain some of LCS's payment for the raw material as profit.

135.    Also, in or about late 2013, LCS began to use different intermediaries to engage directly with ISIS-connected suppliers for the purchase of raw materials and supplies.  Lafarge and LCS retained the services of this intermediary after he had personally met with the then- Lafarge Group Honorary Chairman and a member of the Lafarge Board of Directors who was a former Lafarge Chief Executive Officer on September 16, 2013.  In an email to Lafarge's Honorary Group Chairman in advance of the meeting, the intermediary explained that he wished to discuss "[t]he security issue of Lafarge  in Syria. I build up strong relationships with civilian and Military Locals including FSA, Kurds and Islamic state which are in control of all logistic path in and out of . . . Lafarge."

136.    Lafarge and LCS executives recognized the illegality under U.S. and Syrian law of transacting with ISIS.  In a December 7, 2013 email  Lafarge executives advised that a competitor cement

company was potentially under investigation by Syrian authorities for "wrongdoings about heavy fuel oil transactions," and compiled a list of topics as to which LCS had an issue of compliance with Syrian government regulations, including "Purchasing gypsum and pozzolana from rebellion," "Purchasing Heavy Fuel Oil from rebellion," and "Paying every month the various rebel entities." The executive concluded that some of LCS's conduct was "questionable, even if they are needed for the business continuity." Similarly, on August 18, 2014, Lafarge executives emailed that the U.S. government had placed two militants from ISIS and ANF on the Specially Designated Global Terrorists list, which designation "institutes a travel ban on both individuals and also freezes any assets they may hold inside the United States."

137.    Ultimately, Lafarge and LCS executives approved the purchase of raw materials from ISIS-controlled quarries.

138.    With the approval of Lafarge and LCS executives, an intermediary negotiated for LCS to purchase from ISIS critical raw materials necessary to the operation of the Jalabiyeh Cement Plant, including coal, fuel and pozzolana from the fall and winter of 2013 into early 2014. The intermediary indicated in correspondence with LCS that he would use Raqqah-based suppliers with direct ties to ISIS to deliver pozzolana.

139.    Negotiations into early 2014 culminated in LCS's agreement to purchase from ISIS-controlled suppliers 100,000 tons of pozzolana at 1,650 Syrian pounds per ton, another 100,000 tons of pozzolana at 1,675 Syrian pounds per ton, 4,000 tons of heavy fuel oil at 39,000 Syrian pounds per ton, another 12,000 tons of heavy fuel oil at 26,500 Syrian pounds per ton, 15,000 tons of "dirt" fuel at 17,500 Syrian pounds per ton, and an option for 35,000 additional tons of dirty fuel at the same price, as well as yellow sand and coal.

IV.    **Lafarge and LCS Conceal the True Purpose of the Payments to the Intermediaries**

140.    Lafarge and LCS executives took steps to conceal payments made to the Intermediaries. In this regard, Lafarge and LCS executives directed the intermediaries to submit invoices that did not reference their own names or the names of their companies, and that referenced payments for donations, unspecified professional fees, or personal expenses, in part to avoid discovery of their payments to ISIS-controlled suppliers.

141.    Lafarge and LCS adopted methods of payment to Intermediary 1 that were designed to arouse less suspicion by LCS's external auditors and conceal the purpose of the payments.

142.    A Lafarge executive repeatedly instructed Intermediary 1 to submit invoices for payment for his "security" services that did not reference the name of the intermediary or his company, but rather directed the intermediary to create a new corporate entity ostensibly unrelated to the intermediary from which to submit invoices for "security" services.

143.    Lafarge executives were also directly involved in falsifying records relating to the payments made to the Intermediaries.  For example, in an August 5, 2013 a Lafarge executive wrote and email other Lafarge executives asking, "Could you please approve, sign and send me back a scanned copy of the attached expense claim for the recently agreed remuneration of …….?  It will be transfered directly to his offshore account from an account LCS is having through [a Lafarge subsidiary] in Egypt. This is the way we intend to proceed in the future to severe any suspicion in connecting LCS and [the intermediary]."  The attached expense claim form called for the payment of $75,000 in cash for "Operating expenses for July 2013," and the corresponding code of "Expat others.

144.    Lafarge and LCS executives made similar efforts to disguise the nature of the payments to other intermediaries which are further detailed in the Statement of Facts to which Lafarge has plead guilty.  *See Statement of Facts* https://www.justice.gov/usao-edny/media/1253781/dl.

**V.    Lafarge and LCS Attempt to Negotiate a Long-Term Revenue-Sharing Agreement with ISIS**

145.    As ISIS gained strength and control of more territory near the Jalabiyeh Cement Plant, ISIS sought to increase its share of LCS's sales revenue. LCS was warned by the intermediaries that LCS needed to be careful not to provoke ISIS to take over the Jalabiyeh Cement Plant.

146.    In response, Lafarge and LCS executives authorized the intermediaries to negotiate an agreement to pay ISIS an amount based on the revenue from the plant in return for passes that allowed LCS employees, suppliers and distributors to pass through ISIS checkpoints on the roads leading to the Jalabiyeh Cement Plant.  Throughout the negotiations, Lafarge and LCS executives insisted that the name "Lafarge" not appear on any contract with ISIS or on the passes issued by ISIS.  Later, when the negotiations eventually broke down in the midst of a growing international and multilateral effort to defeat ISIS, Lafarge and LCS executives concealed their ties to the intermediary.

147.    Throughout negotiations with ISIS, Lafarge and LCS emphasized the need to block or tax imports of cement from Turkey into Syria in a manner comparable to the levies imposed by ISIS on LCS's cement.

148.     Lafarge and LCS executives repeatedly expressed their commitment to revenue sharing with ISIS in the hope that it would incentivize the terrorist group to act in LCS's economic interest.

149.    The intermediary followed the instructions in negotiating an agreement with ISIS. He regularly updated executives from Lafarge and LCS about the progress of negotiations and received frequent reminders from them to eliminate any direct reference to "Lafarge" from documents to discount prices to LCS's customers based on the customers' payments to ISIS, and to obtain ISIS's agreement to tax Turkish cement imports to allow LCS to increase the price of its cement.  After entering into the revenue-sharing agreement with ISIS, Lafarge executives were involved in the negotiations with ISIS updated Lafarge's Executive Committee. Notes of Lafarge's August 27, 2014 Executive Committee meeting reflect that during the meeting Lafarge executives highlighted ISIS's agreement to impose costs

on imported Turkish cement that were equal to the costs imposed on LCS: "In our agreement with Daesh [ISIS], we said that in terms of taxation we must have the same treatment as Turkish imports."

150.    Pursuant to its agreement with LCS, ISIS issued to LCS vehicle passes, which specifically referred to Lafarge, that the drivers of cement trucks could show to ISIS terrorists to demonstrate their authorization to pass through ISIS-controlled checkpoints.

## VI.    LCS Evacuates the Jalabiyeh Cement Plant

151.    On September 9, 2014, while posing as one of the ISIS-controlled suppliers for whom he had brokered materials purchase agreements with LCS, one of the intermediaries wrote an email to Lafarge executives referencing "Lafarge crisis pending payments" stating, "For past 2 months [LCS] didn't pay us our money… Please try to understand this money of supplier who work with strongest islamist army on ground so Lafarge shouldn't mess around with them…[an individual] did the impossible to calm them down…but Lafarge cross the line. We need total by the end of this month Please situations become critical."

152.    On September 10, 2014, President Barack Obama addressed the nation to outline the United States' strategy to lead an international coalition to "degrade and ultimately destroy" ISIS through direct military action, and the President identified ISIS as "a terrorist organization, pure and simple" with "no vision other than the slaughter of all who stand in its way."

153.    On September 12, 2014, Lafarge executives exchanged emails with the subject line "Syria", which read in part: "The two points that worry the legal unit are our relationship with […….] and the contacts of our providers and distributors with the jihadist networks." He wrote:

> I think it's imperative to maintain the plant in working order and to be able to restart quickly.  We can, provided we accept the costs, ask the Kurds to ensure the physical protection of the site and of the Lafarge families who wish to remain there to continue maintenance work.  It seems to me that this option is totally doable, if the strikes of the coalition quickly weaken the jihadist forces.  The plant will no longer be an objective for them.

154.    Ultimately, however, LCS evacuated the Jalabiyeh Cement Plant just ahead of advancing ISIS militants, on or about September 18, 2014. ISIS seized the plant the next day, on September 19, 2014. After ISIS militants seized control of the Jalabiyeh Cement Plant, ISIS released propaganda videos showing a small number of its fighters driving between the cement factory buildings.

## VII.    Lafarge and LCS Executives Falsify Records to Conceal Their Relationship with the Intermediary

155.    Following the evacuation of the Jalabiyeh Cement Plant and the commencement of coalition military action against ISIS, Lafarge and LCS executives attempted to conceal Lafarge's and LCS's relationship with the intermediary to negotiate an agreement with ISIS in July and August 2014. They did so by drafting a backdated contract-termination agreement that would allow them to falsely claim that the Intermediary relationship with LCS had been terminated when he conducted negotiations with ISIS in August and September 2014.

156.    On September 29, 2014, the intermediary notified Lafarge and LCS executives that as had previously requested, he had opened a bank account in Dubai in the name of a new company that was not publicly linked to Intermediary and demanded payment for his services to LCS over the prior three months.

157.    On October 14, 2014, a LCS executive sent an email to the intermediary with the subject line "Agreement for Regional Security Consulting Services," attaching copies of the new consulting agreement between the LCS Holding Company, and the intermediary's new company, and the backdated Termination Agreement between LCS and the intermediary's new company.

158.    The new consultancy agreement provided for a lump sum payment of $210,000 and monthly payments of $30,000 for security consulting. The new consultancy agreement also included a non-disclosure provision, which required the confidentiality of information learned about LCS Holding Company and "its affiliates," such as Lafarge and LCS, "including the existence of this agreement."

159.    Lafarge paid the $210,000 invoice with a wire transfer from Lafarge's operating account at a financial institution in Paris, through the Eastern District of New York, to intermediary banks in New York City, which transmitted the wire to Intermediary 1's New Company account at a financial institution in Dubai.

**VIII.    Holcim Acquires Lafarge Along With its Entanglements with ISIS and ANF**

160.    In early 2014, Lafarge and Holcim, as the two largest multinational building materials companies, began confidential discussions about the prospect of entering into a share- purchase agreement. On or about April 4, 2014, Lafarge and Holcim announced that Holcim would acquire Lafarge.

161.    Before the announcement, Holcim and Lafarge representatives met in March 2014 to exchange information about the material operations and known issues of the parties, such as public litigation and antitrust cases. Here, Holcim had a duty to fully investigate Lafarge's risky conduct, such as operating the Jalabiyah Cement Plant in a region that was known to be controlled by terrorists and that most other multinational businesses had abandoned at the time. Holcim and Lafarge's merger agreement included or should have included representations and warranties requiring Lafarge to disclose material legal risks, including any illegal or potentially illegal conduct, such that Lafarge's failure to disclose such issues would lead to termination of the deal or post-closing liability. As public companies, in particular, Holcim and Lafarge had disclosure obligations under securities laws as undisclosed misconduct such as payments to terror organizations could result in serious consequences that would affect shareholder value. As the acquirer, Holcim owed a duty to its shareholders to conduct legal due diligence to uncover any compliance risks, including violations of antitrust or anti-bribery laws, and potential anti-competitive practices, such as paying terrorists to harm competitors business interests. In

some instances, targets may voluntarily disclose illegal conduct to obtain favorable terms, such as indemnities, purchase price adjustments, or regulatory leniency.

162.    According to a Statement of Facts document filed as an attachment to a Plea Agreement that the Department of Justice negotiated and entered into with Lafarge, which by then was a wholly-owned subsidiary owned and controlled by Holcim, it is clear that the Holcim Defendants at no point during the pre- and post-acquisition due diligence process, in complete violation of a proper due diligence process, ever inquired about LCS's operations in Syria, including at the Jalabiyeh Cement Plant, even though at the time it was publicly known to be in an area controlled by US designated FTOs. As Holcim continued its due diligence process, Lafarge continued to negotiate, do business and engage in conduct to hinder the activities of its competitors, in violation of the ATA and possibly antitrust law, with the FTOs, including instructing its intermediary with ISIS to demand that ISIS stop the flow of Turkish and Iraki cement as a means to inhibit Lafarge's competitors and allow Lafarge to raise its prices, as recounted above. On information and belief, it is likely that Lafarge was required to disclose its anticompetitive conduct to Holcim and the U.S. authorities conducting the antitrust merger review process, Pursuant to the acquisition agreement terms between Lafarge and Holcim, the Holcim Defendants is fully liable and responsible for the debts and potentially illegal acts of Lafarge that predate the acquisition.

## IX.    Lafarge's and LCS's Misconduct and Holcim, the Successor-in-Interest

163.    On July 10, 2015, Lafarge and Holcim completed the transaction, and Lafarge became a wholly owned subsidiary of Holcim via a public exchange offer in which Holcim acquired the outstanding shares of Lafarge and issued new Holcim shares to those Lafarge shareholders. Initially, the combined entity was rebranded LafargeHolcim [SWX:LHN], but on July 8, 2021, the company announced that it would be revert back to do business as Holcim AG [SWX:HOLN. To this date, the

Holcim Defendants fully owns and therefore remains the successor in interest to the business of Lafarge, and in that capacity is liable for Lafarge's pre-merger activity as defined herein.

164.    Following the acquisition, several Lafarge and LCS executives were terminated or left their jobs, including the Executives who had been involved in the ISIS funding scheme.

165.    On February 19, 2016, a website run by an opposition group to the Syrian regime alleged that Lafarge and LCS had purchased raw materials from and made other payments to ISIS.  The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

166.    According to the Statement of Facts it negotiated with the Department of Justice, Holcim did not learn about LaFarge's conduct until it was made public through the Syrian website in February 2016, and after assessing the allegations, Holcim's head of compliance informed Holcim's Chief Legal and Compliance Officer in April 2016.  Holcim's Chief Legal and Compliance Officer engaged a U.S. law firm (the "U.S. law firm") to conduct a legal analysis of the allegations, which it presented on May 11, 2016.  The same day, Holcim's Chief Legal and Compliance Officer informed the Finance & Audit Committee of Holcim's Board of Directors of the allegations and they directed him to conduct an investigation.  In June 2016, additional law and professional services firms were retained to advise Holcim on the implications of French and Swiss law and to assist in data collection and processing, and in July 2016 the U.S. law firm was formally retained by the Finance & Audit Committee of Holcim's Board to conduct the investigation.

167.    As part of the investigation, the U.S. law firm collected documents, electronic correspondence and other business records from Syria and France.  The U.S. law firm also interviewed key employees and executives from Syria and France between January 11, 2017, and March 24, 2017.  The U.S. law firm summarized its preliminary findings for the Board of Directors on February 28, 2017,

and Holcim issued a corresponding press release on March 2, 2017.  The U.S. law firm presented supplemental findings to Holcim's Board on April 4, 2017, and submitted a final report of its findings to the Board of Directors on April 17, 2017.  On April 24, 2017, Holcim issued a press release announcing the conclusion of the investigation:

> The Board has now concluded the independent investigation and confirmed that a number of measures taken to continue safe operations at the Syrian plant were unacceptable, and significant errors of judgement were made that contravened the applicable code of conduct. The findings also confirm that, although these measures were instigated by local and regional management, selected members of Group management were aware of circumstances indicating that violations of Lafarge's established standards of business conduct had taken place...

Holcim also publicly disclosed that payments were made to U.S.-designated terrorist groups:

> The safety and security of LCS employees was of primary concern.
> As the situation in Syria deteriorated in late 2011, the plant became increasingly subject to disruption by local armed groups.  These groups periodically interfered with employee transportation to and from the plant, restricted access to necessary supplies, and harassed customers.  To deal with these problems, LCS used intermediaries to avoid direct contact with these armed groups as there was concern that direct contact would create additional risk vis-à-vis the Syrian government or other armed groups.
>
> Very simply, chaos reigned, and it was the task of local management to ensure that the intermediaries did whatever was necessary to secure its supply chain and the free movement of its employees.  As a result, notwithstanding any reservations they had regarding these intermediaries, LCS made and continued to make payments to such intermediaries in furtherance of operations.  Having identified a mechanism for dealing with the challenges they faced, these methods were applied without regard to the identity of the groups involved.
>
> Beginning in early 2013, terrorist groups designated by the US and the EU were expanding into the area, along with other non-designated militant groups.  It was in this chaotic environment that LCS operated and tried to keep its doors open.  LCS management believed it was serving the best interests of the company and its employees who depended on LCS salaries for their livelihood.
>
> LCS management kept Lafarge SA well informed of developments and security- related concerns through their appointed chain of authority.
>
> Those responsible for the Syria operations appear to have acted in a manner they thought was in the best interests of the company and its employees and, based on their communication and consultation along that same chain, in the belief that their efforts were

fully understood, supported, and appreciated by their senior management. In hindsight any misdeeds may seem clear. However, the combination of the war zone chaos and the "can-do" approach to maintain operations in these circumstances may have caused those involved to seriously misjudge the situation and to neglect to focus sufficiently on the legal and reputational implications of their conduct.

168.    The U.S. Government has stated that during its investigation the evidence it obtained establishes that  Lafarge and LCS, through their executives and employees, agreed to make payments through intermediaries to armed groups, ultimately including ISIS and ANF to, among other things, protect LCS's employees and assets in Syria, obtain raw materials for cement production at the Jalabiyeh Cement Plant and achieve a competitive advantage over  Lafarge's competitors.

169.    The U.S. Government has further stated that during its investigation the Lafarge and LCS executives who participated in the offense conduct were located in France, Syria, Egypt, Jordan, Lebanon, Turkey and the United Arab Emirates at various times during their participation in the offense.

170.     Lafarge and certain of its executives, have alleged that they failed to disclose LCS's dealings with ISIS and ANF to Holcim throughout discussions of the transaction and after completion of the deal, yet it is clear that the Holcim Defendants did not conduct pre-acquisition due diligence about LCS's operations in Syria despite public knowledge that the Jalabiyeh Cement Plant was operated in a region known to be controlled by foreign designated terrorist organizations. LCS proceeded to cease producing cement in Syria while the transaction with Holcim was pending.  Nevertheless, in the approximately seven months between the completion of the acquisition and the emergence of public allegations regarding the misconduct in Syria, Holcim did not conduct post-acquisition due diligence about LCS's operations in Syria.

171.    Following the completion of the internal investigation, Holcim terminated all former Lafarge and LCS employees still employed by Holcim who were found to have been involved in or responsible for Lafarge's and LCS's offensive conduct.  This, however, does not absolve the Holcim

Defendants, including but not limited to in their capacity as the successor in interest to the Lafarge Defendants, for the illegal and improper conduct of the Lafarge Defendants, thereby rendering the Holcim Defendants fully liable for the acts of the Lafarge Defendants.

### X.    DEFENDANTS' AID FACILITATED ISIS ATTACKS ON AMERICANS

#### A.    ISIS Followed Al-Qaeda's Globally Integrated Terror Network Model That Facilitated Cooperation Between Islamic State Branches

172.    Islamic State's terrorist campaign against the United States was guided by a number of terrorist first principles, including, but not limited to, Islamic State's: (1) emulation of al-Qaeda and al-Qaeda-in-Iraq, and absorption of their networks, personnel, funds, and relationships; (2) operating as an integrated global network, which disregarded national boundaries; (3) a multi-national corporation model, which emphasized partnership between Islamic State branches; (4) reliance upon protection money payments extracted from companies to finance terrorist operations;.

#### B.    Islamic State Emulated Al-Qaeda

173.    Islamic State self-identified as the heir to bin Laden's legacy.

174.    Islamic State relied upon al-Qaeda and al-Qaeda-in-Iraq operatives who switched allegiance to Islamic State to fuel its rapid growth.

175.    Islamic State copy-catted or otherwise absorbed al-Qaeda's: hatred of the United States and targeting of Americans in the Middle East to drive the U.S. from the region; Salafist ideology; organizational structure; specific bureaucracies; and policies and procedures.

176.    Islamic State also assumed possession of al-Qaeda-in-Iraq's weapons stockpiles, cash reserves, safe houses, logistics pipelines, facilitators, and protection rackets (including the associated relationships with business and their agents) in Iraq and Syria.

177.    Islamic State fully adopted and applied the terrorist logistics, finance, and operational infrastructure and practices of al-Qaeda-in-Iraq from its inception in 2014 through the present. For

example, Islamic State's finance apparatus was structurally similar to that of al-Qaeda-in-Iraq, and Islamic State operated similar internal bureaucracies dedicated to the raising and movement of funds, especially U.S. dollars.

178.    Islamic State was devoted to the al-Qaeda-in-Iraq protection money framework and strategy.  Like its predecessor, Islamic State relied upon protection money payments from Western contractors and corporations, like Defendants.  As Under Secretary Cohen publicly explained in in 2014, Islamic State "mimic[ked]" "AQI's extortion networks" in order to finance its attacks.  Indeed, leveraging al-Qaeda in Iraq's experience running protection rackets, Islamic State  extracted protection payments even when it did not control territory.

179.    Like al-Qaeda and al-Qaeda-in-Iraq, Islamic State also embraced the use of "polyterrorists."  Indeed, Islamic State professed to be even more willing than other organizations to embrace such terrorists, as Islamic State attempted to position itself as a "catchall" pan-Islamist organization that welcomed the involvement of terrorists from other groups, whom Islamic State used to further augment their ranks through "hybridized" cells.

### 1.    Islamic State Operated As An Integrated Global Network

180.    Like al-Qaeda, Islamic State operated as a globally integrated terrorist network, led by a "core" but operationalized by terrorists in dozens of countries, including branches throughout the Middle East.

181.    Terrorists from Islamic State's "core" in Iraq and Syria committed attacks against Americans in Iraq, Syria, and Afghanistan, and on a few occasions in Europe and Africa.

182.     Islamic State's globally integrated network was always led by Islamic State's emir, who was also known as the "caliph" at certain times.

183.    Under Islamic State's globally integrated approach, every Islamic State terrorist associated with any Islamic State branch pledged allegiance to the emir, who was sometimes known as the caliph.

2.    *Islamic State Followed A Multi-National Corporation Model*

184.    Islamic State generally embraced, often to the letter, al-Qaeda's and al-Qaeda-in- Iraq's multinational-corporate-inspired governance and business models, including al-Qaeda's use of branches, command-and-control system, organizational structures, and ideological mission.

185.    Islamic State also continued al-Qaeda-in-Iraq's tactic of undercutting their competition in the illicit marketplace.

186.    Confiscated Islamic State terrorist training manuals revealed that Islamic State, like al-Qaeda-in-Iraq, aimed to build out a formal and centralized terrorist-run state, supported by an array of administrative functions that focused on collecting "taxes" from companies with business interests in Islamic State's territory and creating terrorist training camps so that Islamic State could grow its caliphate beyond Iraq and Syria, with a particular emphasis on Afghanistan.

187.    Islamic State's "Military Council" was charged with the defense of the Caliphate, i.e., conducting terrorist attacks against America and its Iraqi allies.

188.    Islamic State's "Fighters Assistance Council" funded foreign fighters through Islamic State revenues in Iraq and Syria, including the flow of such fighters between Islamic State's Iraq/Syria core and its branch in Afghanistan.

189.    Islamic State had a sophisticated, well-developed, and complex financial structure. Islamic State's Finance Council was a cabinet level entity that managed Islamic State's revenue and expenditures derived from illicit proceeds from occupation of territory, including Islamic State's protection rackets and illicit taxation of goods and cash that transited territory where Islamic State

operated. The "Finance Council" governed all revenue and expenditure streams, established and approved annual budgets, and managed it all with a Chief Financial Officer. Islamic State's Finance Council oversaw the financial infrastructure of the organization and managed Islamic State's cash-based finances via "finance distribution and tax collection centers" in Mosul and "finance storage centers" or cash storage sites in Al Qaim, near the Iraqi-Syrian border. Islamic State also operated "taxation offices" replete with financial auditors.

> 3.    *Islamic State Relied Upon Protection Money Payments And Donations To Fund Its Global Terrorist Campaign*

190.    Islamic State also modeled al-Qaeda's and al-Qaeda-in-Iraq's doctrinal emphasis on the use of protection rackets and donations as two cornerstones of the group's terrorist finance strategy. In so doing, Islamic State adopted the same tactics, techniques and procedures as practiced by al-Qaeda and al-Qaeda-in-Iraq.

191.    From 2014 through 2021, including during the period following Holcim's acquisition of Lafarge, the Islamic State relied upon sophisticated protection rackets in Iraq and Syria to finance Islamic State's operations in Iraq and Syria, as well as Islamic State's operations through key Islamic State branches.

## XI.    DEFENDANTS KNEW THEY WERE AIDING ATTACKS ON AMERICANS BY AL-QAEDA, AL-QAEDA-IN-IRAQ, AND ISLAMIC STATE

### A.    Defendants Admitted They Engaged In Illegal Transactions That Foreseeably Caused Protection Money To Flow To Terrorists And Obstructed United States Counterterrorism Efforts

192.    Defendants Lafarge and LCS. have, in sum and substance, admitted that they caused protection payments to flow to ISIS from at least 2013 through at least 2014 and that they obstructed U.S. counterterrorism efforts. See https://www.justice.gov/usao-edny/media/1253781/dl.

193.    Even Defendants' admissions did not go nearly as far enough:  Defendants fatuously implied that it was some mystery where their illicit payments went, when Defendants were well aware that the only plausible explanation was that Defendants' intermediaries paid ISIS on Defendants' behalf.

B.    Defendants Knew They Operated In A Hyper-Corrupt Environment In Which Corporations Commonly Made Protection Payments To Terrorists

194.    Defendants knew they operated in a business environment that posed extreme terrorist finance risks because Syria was hyper-corrupt and Western companies there – and their regional and local partners, consultants, and contractors – routinely made protection payments as the cost of doing business. These conditions were always obvious to Defendants.

195.    Lafarge and LCS are sophisticated companies that specialize in performing work in high-risk countries.  Given their integrated business model in which the latter serves as a division of the former, and the contractual role they undertook to monitor the local security environment, Defendants each monitored open-source reporting on the risks of operating in Iraq, Syria, and other risky environments in which they operated.  As part of those efforts, Defendants' standard practice would have been to conduct basic research on the local market and the mechanics of local subcontracting.

196.    On information and belief, Defendants were aware of the reports, statements, studies, events, and litigations below, or similar ones, and their substance, which alerted Defendants that their conduct foreseeably aided anti-American terrorists through Defendants officers, employees, and agents.

197.    Defendants' management, and their compliance, legal, and corporate security departments, also subscribed to intelligence reporting services that further alerted them to the link between their corrupt contracting practices and terrorist finance.

1.    *Defendants Knew Their Illicit Transactions With Intermediaries Caused Protection Payments To Flow To Terrorists*

198.    Defendants knew, and intended, that their illicit transactions with their partners, consultants, and contractors were designed to, and were, for facilitating protection payments through such intermediaries on behalf of Defendants.

199.    Defendants knew their practice of routing illicit cash payments and other illicit value through intermediaries, including Defendants' self-described partners was a tactic to conceal Defendants' regular protection payments to terrorists.

200.    Defendants knew that the excessive fees they illicitly routed to their intermediary partners, consultants, and contractors were red flags for unlawful payments.

201.    Defendants knew that their inability to document the services provided by their intermediary partners, consultants, and contractors was a red flag that such intermediaries were passing value along to another, i.e., the terrorists.

202.    Defendants knew that a substantial percentage of corrupt value they helped flow to their intermediaries reached ISIS.

### 2.    Defendants Knew Their Deliberately Deficient Internal Controls Were An Intentional Tactic To Conceal Their Protection Payments

203.    Defendants also knew their intentionally deficient internal controls were a feature, not a bug, and were purpose-built to facilitate Defendant's corrupt payments, including its protection payments to terrorists.

204.    Defendants knew their intentionally deficient internal controls facilitated protection payments to terrorists because Defendants' employees and agents in Syria Iraq –knew such fact to be true.

205.    Defendants also knew their practice of facilitating payments without clear beneficiaries facilitated protection payments to terrorists because Defendants' employees and agents in Syria knew such fact to be true.

206.    United States government reports alerted the Lafarge Defendants that Lafarge's practice of facilitating illicit payments without clear beneficiaries was a tactic used to conceal terrorist finance. Such reports and statements included, but were not limited to:

a. Treasury Department, September 2006: "[D]onors are encouraged to … consider[] protective measures to prevent … abuse by terrorists. … [E]ffective internal controls … can prevent … terrorist financing …".[3] "When supplying [] resources …, fiscal responsibility on the part of a [payor] should include: … determining that the potential grantee of … contributions has the ability to … protect the resources from … exploitation by terrorist organizations and/or their support networks …"[4]

b. DOJ and SEC, November 2012: "Effective policies and procedures require an in-depth understanding of the company's business model, including its products and services, third-party agents, customers, government interactions, and industry and geographic risks. Among the risks that a company may need to address include the … use of third parties; gifts, travel, and entertainment expenses; … donations; and facilitating and expediting payments. … [Routine corporate internal controls] systems can be a good way to …, if properly implemented, prevent[] and detect[] potential FCPA violations."

c. LIGOIR, May 2018: "An ongoing USAID OIG investigation found that employees of a U.S.-based nongovernmental organization knowingly diverted USAID-funded food kits to a militant organization operating in northern Syria … employees of the non- governmental organization … submitted falsified beneficiary lists to USAID to conceal the [terrorists]' participation in the … program."

d. Senate Finance Committee, December 2020: "A [] robust and fundamentally sound system of screening and vetting is needed to [ensure] that contributions made to [an entity in a high risk terrorist environment] are not funding illicit organizations."

C.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their intentionally deficient Defendants Knew Islamic State's Role

---

[3] Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020, at 20 (May 13, 2020).
[4] U.S. Dep't of the Treasury, U.S Department of the Treasury Anti-Terrorist Financing Guidelines: Voluntary Best Practices for U.S.-Based Charities, at 2-3 (Sept. 2006).

       1.     *Defendants Knew Islamic State Waged A Terrorist Campaign Against The United States*

207.     Defendants knew that ISIS waged a global terrorist campaign against the United States in which Islamic State attacked.

208.     Defendants knew about Islamic State's global terrorist campaign against the United States.

209.     United States government reports alerted both the Lafarge and the Holcim Defendants to the globally interconnected nature of Islamic State's campaign against the United States while Islamic State acted as a caliphate from 2014 through 2017.[5]

210.     Throughout Islamic State's "caliphate" era from 2014 through 2017, U.S. government reports and statements alerted both the Lafarge Defendants and the Holcim Defendants that Islamic State's terrorist campaign against the United States posed a severe terrorism risk in the central, northern, and western Iraqi provinces in which Defendants did business.[6]

---

[5] See, e.g., The White House, Fact Sheet: Strategy to Counter the Islamic State of Iraq and the Levant (ISIL) (Sept. 10, 2014) ("Islamic State … poses a clear threat to the people of Iraq and Syria, … the broader Middle East, as well as U.S. persons, allies and interests in the region. Left unchecked, ISIL could pose a growing threat beyond the region …"), http://tinyurl.com/6yce8e3z; Office of the Director of National Intelligence, Counterterrorism Guide: Islamic State of Iraq and the Levant (ISIL) (2015) (In June 2014, ISIL unilaterally declared the establishment of an Islamic caliphate and called on all Muslims to pledge allegiance to the group. Since then, ISIL has announced the establishment of eight provinces outside of Iraq and Syria, including in Afghanistan and Pakistan …"), https://tinyurl.com/yckhbv89; U.S. Dep't of State, Country Reports on Terrorism 2016 at 8 (July 2017) ("ISIS attacks outside its territorial strongholds in Iraq, Syria, and Libya were an increasingly important part of its terrorism campaign in 2016. Most of these attacks took place in countries where ISIS has a declared branch, such as Afghanistan …."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, July 1, 2017– September 30, 2017, at 26 (Nov. 3, 2017) ("ISIS: Global Reach[.] … Several of the affiliates have acquired funding, weapons, recruitment, and tactics from core ISIS. …ISIS-associated groups were also active in … Afghanistan ...").

[6] E.g., U.S. Dept of State, Country Reports on Terrorism 2015 at 178-79 (June. 2016) ("Iraq witnessed a continued surge of terrorist activity in 2015, primarily as a result of the actions of [] Islamic State …, which has occupied large areas of the country since early 2014. … Terrorist groups continued to mount a large number of attacks throughout the country."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, October 1, 2016–December 31, 2016, at 8 (Feb. 2, 2017) ("[W]hile fighting in Iraq and Syria centered on the battles for Mosul and Raqqah, ISIL militants continued insurgent activity outside of those areas in both countries. For example, ISIL militants reactivated networks in Anbar province and carried out suicide attacks near Karbala in southern Iraq and at checkpoints leading to Fallujah and Amiriyal al-Fallujah."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017, at 47 (May 6, 2017)

211.    Throughout Islamic State's "global insurgency" from 2018 through 2022, United States government reports and statements alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.[7]

212.    Terrorism scholars alerted Defendants to the globally interconnected nature of Islamic State's campaign against the United States.  For example, in 2018, terrorism scholar Katherine Bauer reported that Islamic State's "most significant recent attacks have been traced b ack to groups or 'provinces' operating outside of Syria and Iraq."[8]

213.    From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that Islamic State waged a globally integrated terrorist campaign against the United States.

214.    Defendants' payments to and partnership with ISIS provided ISIS capital to transform from a fledgling militia in the early 2010s into a brutal terroristic behemoth with the capability and intent to kill Americans. The revenue stream enabled the terrorist attacks that targeted Plaintiffs and their family members. Defendants' money translated directly into fighters, guns, and bombs the terrorists used

_____

("ISIS's [recent] activity signaled that [it] was transitioning … to an insurgency … In Iraq, ISIS's insurgent activity consisted of harassing attacks and suicide bombings in the central and western parts of [Iraq]. … ISIS continued to use IED and VBIED attacks … in Baghdad … [and] suicide and VBIED attacks in Anbar …").

[7] E.g., The White House, National Strategy for Counterterrorism of the United States of America, at 8 (Oct. 2018) ("ISIS remains … the primary transnational terrorist threat to the United States … ISIS retains the financial and material resources and expertise to launch external attacks—including against United States interests—and its senior leaders continue to call for attacks against the United States. The group's global reach remains robust, with eight official branches … regularly conducting terrorist and insurgent operations across Africa, Asia, Europe, and the Middle East."); U.S. Dep't of State, Country Reports on Terrorism 2018 at 9 (Oct. 2019) ("ISIS's global presence evolved with affiliates and networks conducting attacks in the Middle East, South and East Asia, and Africa. Additionally, battle-hardened terrorists headed home from the war zone in Syria and Iraq or traveled to third countries, posing new dangers."); U.S. Dep't of State, Country Reports on Terrorism 2020 at 2 (Dec. 2021) ("Although ISIS lost all the territory it had seized in Iraq and Syria, the organization and its branches continued to mount a

[8] Katherine Bauer (Fellow, Washington Institute for Near East Policy), Survey of Terrorist Groups and Their Means of Financing, Testimony Submitted to the House Financial Services Subcommittee on Terrorism and Illicit Finance, at 4 (Sept. 7, 2018), http://tinyurl.com/mter35be.

to plan and execute their terrorist acts against Plaintiffs. It allowed ISIS to create more explosives, capture more territory, recruit new members, disseminate extensive propaganda, and expand to new regions and countries. According to a former U.S. Ambassador to the United Nations, funding enabled ISIS to "pay its followers," create a massive salaried military force that included snipers, planners, and suicide bombers, and "fund attacks around the world."

215. Given the low costs of terrorist attacks, Defendants' payments had a substantial impact on ISIS's capabilities. Their multimillion-dollar bribes were enough to finance thousands of ISIS terrorist attacks—enough to kill and maim every Plaintiff in this case many times over. These attacks were the foreseeable, obvious and even intended results of doing business with ISIS. Terrorist attacks enabled ISIS to maintain and expand its control over territories and markets. The more territory and markets ISIS controlled, the greater the co-conspirators' profits.

      *2.*    *Defendants Knew Protection Payments Aided Islamic State*

216. Defendants knew protection payments aided Islamic State.

217. United States government reports alerted Defendants that their protection payments aided Islamic State's caliphate from 2014 through 2017.[9]

_____

[9] E.g., U.S. Dep't of State, Country Reports on Terrorism 2014 at 354, 9, 171 (June 2015) ("ISIL receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … ISIL … use[d] … criminal activities to raise funds for operational purposes. … ISIL earned up to several million dollars per month through its [] extortion networks … In 2014, ISIL derived income from [inter alia] … extortion, illegal 'taxation,' … and foreign donations. … [T]he United States used sanctions to ensure that banks, companies, and citizens across the world did not engage in financial transactions with ISIL."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Quarterly Report to the United States Congress, April 1, 2015–June 30, 2015, at 46 (Aug. 24,2015) ("ISIL … use[d] … criminal activities to raise funds for operational purposes. Much of ISIL's funding, … was [] gathered in Iraq and Syria. ISIL earned up to several million dollars per month through its [] extortion networks …"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Quarterly Report and Biannual Report to the United States Congress, September 30, 2015, at 58, 61, 63, 64-5 (Nov. 25, 2015) ("ISIL … derives most of its revenue from its control of territory[,] [including] extortion/taxation … ISIL's funds come from several key sources[,] [including] … taxes and extortion from the occupied territories … Most of these constitute a 'sophisticated extortion racket[] … [R]eceipts that confirm ISIL is collecting a 20% 'khums tax' … and that the tax collections are being enforced across the territory it controls. … ISIL also requires local populations in those territories to pay it a percentage of any salary (largely paid in cash). ISIL further imposes

218.    Similar U.S. government reports alerted the Defendants that the protection payments aided Islamic State's "global insurgency" from 2018 through 2022.[10]

---

'taxes' on all types of business activities. … ISIL 'stands to profit from taxing all of the sources of revenue to the tune of hundreds of millions of dollars per year.'"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Quarterly Report to the United States Congress, October 1, 2015−December 31, 2015, at 70-72 (Feb. 16, 2016) ("ISIL's extortion [] and taxation … have funded its military machine for years. … ISIL's administrative apparatus enables it to generate revenue through taxation … and the collection of fees for everything [including] sales of goods … [O]il is second only to taxation and extortion as a source of income for ISIL."); U.S. Dep't of State, Country Reports on Terrorism 2015 at 6 (June. 2016) ("ISIL relies heavily on extortion and the levying of 'taxes' on local populations under its control …"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, January 1, 2017–March 31, 2017, at 45-46 (May 6, 2017) ("ISIS continued to be able to finance operations in Iraq and Syria … ISIS generates the majority of its revenue from … taxes [] and extortion …"); U.S. Dep't of State, Country Reports on Terrorism 2016 at 408 (July 2017) ("ISIS receives most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion …"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, April 1, 2017–June 30, 2017, at 23 (Aug. 3, 2017) ("Coalition airstrikes also killed [ISIS] financial facilitators … and destroyed several ISIS cash storage facilities in Iraq and Syria. Fawaz al-Rawi and Samir Idris were accused of moving millions of dollars for the ISIS network. However, … ISIS still generates millions of dollars … from illegal taxation and extortion …").

[10] E.g., U.S. Dep't of the Treasury, National Strategy for Combating Terrorist and Other Illicit Financing, at 25 (2018) ("ISIS derives most of its revenue from … the extortion and taxation of civilian populations and economies in Iraq and Syria … However, ISIS also receives limited financial support from within the United States. … U.S.-based individuals have raised or solicited funds specifically for the group itself. These funds are often derived from legitimate sources as well as from small-scale criminal activity. ISIS financiers and supporters abroad also send funds to other ISIS supporters or regional affiliates in foreign jurisdictions that may be routed through the U.S. financial system and may seek to procure sensitive or controlled goods from U.S.-based companies."); U.S. Dep't of State, Country Reports on Terrorism 2017 at 304, 132 (Sept. 2018) ("ISIS received most of its funding from a variety of businesses and criminal activities … in Iraq and Syria … include[ing] … extortion … In 2017, the Government of Iraq … continued to dismantle ISIS's financial activity and safeguard its financial institutions from exploitation by ISIS. Iraq enforced a national directive to prohibit financial transactions with banks and financial companies located in ISIS controlled areas. It … prohibited … companies located in ISIS-held areas and those suspected of illicit activity from accessing U.S. banknotes … Iraq also barred ISIS financial facilitators … from Iraq's financial system and froze all of their assets."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, October 1, 2018–December 31, 2018, at 21-22, 31 (Feb. 4, 2019) ("[T]he bulk of ISIS financial and military resources is generated in Iraq and Syria, … ISIS branches worldwide contribute varying degrees of support to the ISIS leadership … ISIS continued to extort money from both individuals and construction companies seeking to rebuild destroyed infrastructure. … ISIS could insert operatives into the reconstruction effort to siphon off money. … Extortion remains a major source of income for [ISIS] … Independent analysts also suggested that ISIS would likely seek to extort companies engaged in reconstruction in Iraq, and would also insert operatives into reconstruction entities to divert funds to terrorist activities. … [A]part from these efforts, ISIS in Iraq gains revenue from [inter alia] … taxation …"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, October 1, 2019–December 31, 2019, at 41 (Feb. 4, 2020) ("ISIS Generates Revenue Even After Loss of Territory … ISIS continues to generate revenue by [inter alia]… extortion, and … front companies."); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, January 1, 2020–March 31, 2020, at 20, 51 (May 13, 2020) ("[E]ven with its territorial defeat, ISIS continues to generate funds in Syria through extortion … and the use of front companies. … ISIS is increasingly brazen in its revenue-producing activities in Iraq and Syria. … ISIS members [] openly extort[] …. ISIS [is] able to move more freely [and] extort protection money …"); Lead Inspector General for Overseas Contingency Operations, Operation Inherent Resolve, Report to the United States Congress, January 1, 2021–March 31, 2021, at 15 (May 4, 2021) ("ISIS generated revenue from extortion, … and moves resources to its safe havens and to operatives throughout Iraq. … ISIS used similar fundraising tactics in Syria, targeting civilian businesses … for possible utilization as front companies."); U.S. Dep't of State, Country Reports on Terrorism 2020 at 275

219.      Financial Action Task Force reports alerted Defendants that protection money payments played a key role in financing Islamic State's operations around the world, including in Iraq, Syria, and Afghanistan. In February 2015, for example, the FATF published guidance concerning Islamic State terrorist finance, which concluded, among other things, that:

a. "[F]unding is central and critical to [Islamic State's] activities. … ISIL's primary sources of revenue … include … extortion … Cutting off these vast revenue streams is … [an] opportunity … to defeat this terrorist organisation."[11]

b. "ISIL is operating in vast swathes of land across Syria and northern Iraq, allowing ISIL to exploit the local population and material resources through extortion … ISIL takes advantage of the resources in this domain, … taxing local economies. … ISIL obtains the vast majority of its revenues through local criminal and extortion activities …"[12]

c. "ISIL earns revenue primarily from five sources, listed in order of magnitude: (1) illicit proceeds from occupation of territory, such as … extortion, … illicit taxation of goods and cash that transit territory where ISIL operates; … (3) donations …"[13]

d. "ISIL manages a sophisticated extortion racket by … demanding a portion of the economic resources … [like] how … organized crime groups generate funds. This vast range of extortion, including everything from … vehicle taxes to school fees …, is done under the auspices of providing notional services or 'protection.'"[14]

e. "ISIL has attempted to demonstrate a degree of sophistication and a formalized, structured internal financial management system by providing receipts for levies paid."[15]

f. "Trade of goods and transfers of cash into and out of ISIL-held territory has been significantly disrupted due to the weak security environment. However, according to industry contacts and press reporting, some trade of goods has persisted, as have cash transfers necessary for financing this trade. ISIL is able to impose levies on all goods transiting territory where it operates. ISIL has reportedly imposed specific taxes on the

---

(Dec. 2021) ("ISIS received most of its funding from … criminal activities in Iraq and Syria … include[ing] extortion of civilian economies … ISIS also maintains stockpiles of as much as hundreds of millions of dollars scattered across Iraq and Syria it looted … in 2013 to 2019. … ISIS continues to generate revenue from criminal activities through its many clandestine networks in Iraq and Syria and provides significant financial support and guidance to its network of global branches …").

[11] Financial Action Task Force, FATF Report: Financing of the Terrorist Organisation Islamic State in Iraq and the Levant (ISIL), at 5 (Feb. 2015), https://tinyurl.com/5b98bmbh.

[12] Id. at 10.

[13] Id. at 12.

[14] Id.

[15] Id.

movement of goods in parts of Iraq where it operates, including a road tax of 200 USD in northern Iraq and an 800 USD 'customs' tax on trucks entering Iraq …"[16]

g. "Some delegations identified terrorist financing risks regarding wire transfers from charitable foundations to conflict zones or areas where ISIL operates. Other risks identified include … raising funds for recipients in a third country which are or are suspected to be part of an organisation [] that engages in violent … activities. These risks are enhanced when the source of the funds and purpose of the transaction is not known or cannot be verified. These instances include transactions not listing any reference or using generic terms such as 'other', 'services' and 'goods'. In some cases, public appeals for donations have not correlated with the organisations' stated purpose (e.g. educational, health care or humanitarian relief)."[17]

h. "ISIL[] will always require funds for operational support and to meet broad organisational requirements. … This report … identif[ied] the most important sources of ISIL funding, particularly … extortion …"[18]

220.    Media reports alerted Defendants that protection payments aided Islamic State. In 2014, for example, *Forbes* analyzed Islamic State's tax rules, which alerted Defendants that their protection payments directly financed anti-American terrorism:

i. "Initially, [ISIS] depended on outright violence to raise cash. But as ISIS made the transition to [Islamic State], its revenue extraction became more sophisticated. … ISIL enforced taxes on a variety of commercial activities, including telecommunications companies that had relay towers in ISIL-controlled zones."

j. "The *New York Times* [] noted the extent to which ISIS is regularizing its … tax process.… 'Many … received official receipts stamped with the ISIS logo … These forms of taxation … increasingly carry the trappings of regularized tax collection.'"[19]

221.    In 2015, similarly, the *New York Times* reported the typical experience of any businesses operating inside Islamic State-controlled territory:

a. "Three times a month, Mohammad al-Kirayfawai hands $300 to fighters from the Islamic State for the privilege of driving his refrigerated truck full of ice cream and

---

[16] *Id.* at 17.
[17] *Id.* at 19.
[18] *Id.* at 32.
[19] Joseph Thorndike, *How ISIS Is Using Taxes To Build A Terrorist State*, Forbes (Aug. 18, 2014), https://tinyurl.com/5c3wa2ap

other perishables from Jordan to a part of Iraq where the militants are firmly in charge.  The fighters who man the border post treat the payment as an import duty, not a bribe. They even provide a stamped receipt, with the logo and seal of the Islamic State, that Mr. Kirayfawai, 38, needs for passing through other checkpoints on his delivery route."

b.  "Across wide expanses of Syria and Iraq, [] Islamic State … has set up a predatory and violent bureaucracy that wrings every last American dollar … it can from those who live under its control or pass through its territory."

c.  "Islamic State[] … exact[ed] tolls and traffic tickets; rent for government buildings; utility bills for water and electricity; taxes on income, crops and cattle; and fines for smoking or wearing the wrong clothes."

d.  "'They fight in the morning and they tax in the afternoon,' said Louise Shelley, … of the Terrorism, Transnational Crime and Corruption Center at George Mason University."

e.  "[A]s Western and Middle Eastern officials have gained a better understanding of the Islamic State's finances over the past year, a broad consensus has emerged that its biggest source of cash appears to be the people it rules, and the businesses it controls."

f.  "Inside that territory, [] Islamic State … has taken over the legitimate revenue collection operations of the governments it has usurped. And it has … extract[ed] as much as it can from the people, businesses and property it now controls."

g.  "Another Islamic State department, the Diwan al-Rikaz, or the Office of Resources, oversees … a long list of other businesses now controlled by the militants. It operates … mobile phone companies … skimming revenues from all of them."

h.  "The Islamic State also demands a cut of the revenues earned by small businesses. 'We either pay in [goods] or cash, it depends on the production,' said Tarek, a Syrian …"

i.  "Officials of the so-called caliphate dislike the term 'tax,' preferring the Islamic term '*zakat*,' which refers to the alms Muslims are required to pay. Although the norm would be 2.5 percent of a person's wealth under typical interpretations of Islamic law, the militants are taking 10 percent, justifying the high rate by saying they are a 'nation in a time of war,' according to a citizen journalist in Raqqa …"

j.  "Islamic State is extracting as much as $800 or $900 million, possibly more, from residents or businessmen inside the territory it controls."

k.  "[U.S. government] [o]fficials assume that the Islamic State must be circulating the money it collects back out into the regional and global financial system since there

have not been signs of the kind of rampant inflation that could result from a large influx of currency into a relatively small economy closed off from the surrounding markets."[20]

222.    From the 2014 through 2017, similar media reports alerted Defendants that protection payments aided Islamic State's caliphate.[21]

---

[20] Matthew Rosenberg, Nicholas Kulish and Steven Lee Myers, *Predatory Islamic State Wrings Money From Those It Rules*, New York Times (Nov. 29, 2015).

[21] *E.g.*, Freya Petersen (Australian Broadcasting Corporation), *Islamic State Of Iraq And The Levant (ISIS): An Explainer*, ABC Premium News (Jan. 6, 2014) ("In … Mosul ISIS nets upwards of $8 million a month by extorting taxes from local businesses …"), 2014 WLNR 425449; APS Diplomat Operations in Oil Diplomacy, *Ninewah Autonomy Efforts & Petroleum Projects* (Mar. 3, 2014) ("Said to have an IRGC-run base in Iran near Iraq's north-eastern province of Diyala, the ISIS extorts money from business owners in Mosul, helping to fund its activities in Iraq and Syria. … The tactical alliance between the IRGC and the ISIS is one of the strange things despite the fact that the Neo-Salafi group is killing many Iraqi Shi'ite Arabs …"),2014 WLNR 5861825; Guy Taylor, *Al-Baghdadi, A Brutal Contender For Bin Laden's Mantle, Emerges In Iraq*, Washington Times (June 13, 2014) ("Under al-Baghdadi's leadership, ISIL's strategy has involved … running 'protection rackets' … in northern Iraq. [] [T]he mafia-style tactics may bring in piles of local cash …"), 2014 WLNR 15982987; Der Spiegel Staff, *The New Face of Terror ISIS; Rise Pushes Iraq to Brink*, *reprinted in* Yerepouni Daily News (Lebanon) (June 26, 2014) ("[F]unding comes from … protection money extorted in Mosul and other Sunni cities in Iraq."), 2014 WLNR 17314098; Lee Smith and Hussain Abdul-Hussain, *On The Origin Of ISIS*, Weekly Standard (Sept. 8, 2014) ("Nor are ISIS's money-raising schemes especially novel in the Middle East. … [one of ISIS's … main source[s] … is taxation …"), 2014 WLNR 38032996; Steven Mufson, *Islamic State Fighters Drawing On Oil Assets For Funding And Fuel*, WashingtonPost.com (Sept. 16, 2014) ("Islamic State has obtained revenue by imposing tariffs, [and] exacting protection money …"), 2014 WLNR 25578145; Economist Intelligence Unit, *MENA Politics: The Pushback*, EIU ViewsWire (March 23, 2015) ("[Islamic State] is left with … extortion and taxes levied in the name of *zakat*, Islamic alms."), 2015 WLNR 8488485; Worcester Telegram & Gazette (MA), Editorial, *Our View: Time to Lead* (Dec. 6, 2015) ("ISIS has grown into the world's most dangerous terrorist organization, financed - some say $50 million per month - by [inter alia] … taxes, tolls and extortion from the people living within or entering its borders."), 2015 WLNR 36138427; Senate Armed Services Committee, Advance Questions for General Joseph L. Votel, U.S. Army Nominee for Commander, U. S. Central Command, Targeted News Service, *Gen. Votel Testifies at Hearing on Nomination to be Commander, U.S. Central Command* (Mar. 9, 2016) ("General Joseph L. Votel" "testi[fied] [that]" "Mosul will remain [Islamic State's] finance hub as [Islamic State] likely will increasingly rely on extortion and tax revenue streams ..."); CNN: Early Start, *Trump Escalates War on News Media; Clinton Returns to California to Fight Sanders; Fierce Fighting in Falluja. Aired 4:30-5a* (June 1, 2016) ("ISIS still has a $2 billion empire thanks in part to new taxes. That's according to a new report from the Center for the Analysis of Terrorism, which … says ISIS made $2.4 billion in 2015. … the main reason why is taxes."), 2016 WLNR 16677887; Pioneer, *ISIS Down, Not Out: Ways To Kill It* (July 9, 2016) ("ISIS first occupied significant stretches of territory in Iraq and Syria … It has raised its finances quite skilfully by … engaging in … extortion, [and] levying of taxes, in territories held by it."), 2016 WLNR 20848601; Patrick Wintour, *Saudi Arabia Must Do More To Prevent Secret Funding Of ISIS, MPs Say*, Guardian (July 12, 2016) ("In a report on … ISIS finances, the [U.K. Parliament] claims [ISIS] in Iraq and Syria is increasingly desperate for more money, … resorting to 'gangsterism and protection rackets' disguised as taxation."), 2016 WLNR 21120198; Vivian Salama, Associated Press, *reprinted in* Canadian Press, *As Territory Shrinks, IS Group Looks For New Money Sources* (Oct. 19, 2016) ("[Former Treasury official Daniel] Glaser said … Islamic State … generated some $30 million per month … from taxation and extortion in 2015. Hisham al-Hashimi, an expert on IS…, said [Islamic State] currently makes about $4 million per month from taxes in Mosul alone. Al-Hashimi said the group charges a 4 per cent income tax on salaries less than $600 per month, and 5 per cent on monthly salaries between $600 and $1,000."); Karen DeYoung and Philip Rucker, *Trump Summons Muslim Nations To Confront 'Islamic Terror Of All Kinds'*, WashingtonPost.com (May 21, 2017) ("Islamic State … has largely funded itself through [inter alia] extortion and taxes … in Syria and Iraq …"), 2017 WLNR 15782138.

223.    From the 2018 through 2022, similar media reports alerted Defendants that protection payments aided Islamic State's global insurgency.[22]

224.    Terrorism scholars alerted Defendants that their protection payments aided Islamic State.[23]

## XII.    LAFARGE DEFENDANTS FRAUDULENTLY CONCEALED THEIR SUBSTANTIAL AID

### A.    Lafarge Defendants Fraudulently Concealed Their Protection Payments And Donations To Al-Qaeda, Al-Qaeda-In-Iraq, And Islamic State

---

[22] E.g., Jonathan Walker, Source Of Terror Group's Millions Uncovered In New Report By North MP; Oil, Tax, And Trade Key To Daesh, Sunday Sun (Apr. 29, 2018) ("ISIS raised billions of pounds from [inter alia] … taxing millions of residents … ISIS used a number of lucrative revenue streams to finance its operations across the globe … In recent years [Islamic State] has attempted to make up for the loss of oil revenue by extracting money from the people living in the remaining territory it controls. Almost everything was taxed, including cash withdrawals, salaries, and roads. It also charged a 'protection' tax for non-Islamic residents."), 2018 WLNR 13011934; Ellen Ioanes, Here's What's Left Of ISIS — And Why They Still Pose A Major Threat, Business Insider (Aug. 27, 2019) ("[J]ust because ISIS no longer has a caliphate, that doesn't mean it doesn't have influence or power in the places it once controlled — and that it's not still incredibly dangerous. … In both Iraq and Syria, ISIS is making money by … [inter alia] extorting civilians, and skimming funds off rebuilding contracts …").

[23] Jean-Charles Brisard and Damien Martinez (Al-Qaeda Scholars), *Islamic State: The Economy-Based Terrorist Funding*, at 5 (Thomson Reuters Accelus Oct. 2014) ("Since its inception, the [Islamic State] has relied on" "criminal activity to fund its activities, targeting businessmen, local politicians and clerics, in addition to foreign nationals."), https://tinyurl.com/2d26cvxx; Professor Jimmy Gurulé, *quoted in House Financial Services Committee Hearing on "Terrorist Financing and the Islamic State"; Testimony by Jimmy Gurule, Law Professor, Notre Dame Law School*, *republished in* U.S. Congressional News (Nov. 13, 2014) ("ISIS is primarily self-funded. … illicit taxation systems are also a significant source of income for ISIS. …The … ATA could be used against … [persons] that knowingly transfer funds … to … ISIS."), 2014 WLNR 32049937; *Foundation for Defense of Democracies Vice President, Research Jonathan Schanzer, Prepared Testimony Before the House Financial Services Committee Hearing On Task Force To Investigate Terrorism Financing: A Survey Of Global Terrorism And Terrorist Financing*, *republished in* SEC Wire (Apr. 22, 2015) ("[O]ne dominant trend we continue to observe: the intersection of terrorism and crime. Designated terrorist groups … rather easily [] exploit[] existing businesses and levying oppressive taxes and tolls on the populations they dominate. The Islamic State, for example, extracts taxes …"); *Center For Strategic And International Studies Senior Adviser Mr. Juian C. Zarate, Prepared Testimony Before The House Financial Services Committee Hearing On Task Force TO Investigate Terrorism Financing: A Survey Of Global Terrorisim And Terrorist Financing, As Released By The Committee*, *republished in* SEC Wire (Apr. 22, 2015) ("Islamic State is able to tax … the local population - raising taxes and fees as pressure mounts… This model of financing is not new. For years, al Qaida in Iraq had … extorted … to raise money …"); Peter R. Neumann, *Don't Follow The Money: The Problem With The War On Terrorist Financing*, Foreign Affairs (July 1, 2017) ("[O]nly one thing can truly revolutionize a terrorist group's finances: the seizure of territory. Until 2013, ISIS made most of its money from protection. From 2003 through 2022, the U.S. government, media, terrorism scholars, and others published other reports and statements that alerted Defendants that their protection payments aided Islamic State's terrorist campaign".)

225.     From the summer of 2012 through at least October 18, 2022, Lafarge Defendants actively and fraudulently concealed their illicit transactions with the Islamic State alleged herein to cloak Defendants' illegal activities.

226.     Until at least October 18, 2022, when Lafarge Defendants publicly admitted to much of the corrupt conduct alleged herein, none of the Plaintiffs had any knowledge of Lafarge Defendants' violations alleged herein.  Further, until recently, Plaintiffs could not have discovered, by the exercise of reasonable diligence, that Lafarge Defendants engaged in the violations alleged herein because Lafarge Defendants actively and fraudulently concealed these violations to cloak their illegal activities.

227.     To conceal their unlawful conduct from U.S. authorities and prevent disclosure of the facts to Plaintiffs, Lafarge Defendants routinely structured illicit transactions to conceal their protection payments on Lafarge Defendants' books-and-records, including, but not limited to, through Lafarge Defendants' illicit transactions with their: (i) intermediaries, including their Iraqi partners, consultants, and contractors; (ii) slush funds and cash payoffs; and (iii) deliberately deficient internal controls.

B.     Lafarge Defendants Provided Support Tailored To The Violence At Issue Here

228.     Money supplied the lifeblood of the terrorist campaigns waged by ISIS.  Financing gave this FTO gave ISIS the means to recruit and pay terrorist fighters; to acquire weapons and explosives with which to attack Americans; and to maintain the vast operational infrastructure needed to sustain the global campaign, including their key regional branches.

229.     Lafarge Defendants' protection payments supplied ISIS with an important stream of revenue such FTOs used to finance and facilitate terrorist attacks against Americans. Lafarge Defendants' protection payments, which created an income stream overseen directly by the leadership of ISIS gave Islamic State fungible resources that were vital to such FTOs' ability to the Islamic State's respective terrorist enterprises.

230.     ISIS institutionalized control of their protection money revenue.  The extraction of protection payments occurred via a highly regulated process designed to ensure that such payments would benefit the broader insurgency. Al-Qaeda, al-Qaeda-in-Iraq, and ISIS Islamic State promulgated rules and regulations dictating to local field commanders how to collect protection money from foreign businesses. The money flowed both ways – from local commanders up to ISIS's respective Financial Commissions for use by ISIS central leadership, and conversely from the leadership back down to local commanders for use in the field. That discipline allowed protection money collected from all over Iraq and Syria to finance the Islamic State's terrorist machine.

231.     Protection payments supplied one of the most quantitatively significant sources of terrorist finance for ISIS. Protection payments were always one of the top two fundraising tactics, and for most of the Islamic State's existence, protection money ranked number one. The systematic payments effected by large international companies swamped other, smaller-scale protection rackets.

232.     Protection payments also strengthened ISIS by allowing it to diversify their income. For designated terrorist groups subject to crippling international sanctions, diversification was critical: it offered ISIS a degree of financial resiliency that made it less susceptible to American counterterrorism efforts. That stream of protection money – particularly from larger, well- financed corporations, including Defendants – supplied reliable funding for ISIS and, almost as importantly, offered insurance against the risk of other funding sources drying up.

233.     ISIS's Intelligence Cell, also referred to as the "amniyat" or "Emni," directly linked Lafarge Defendants' aid and the attacks that targeted Plaintiffs. As the New York Times reported based on "thousands of pages of French, Belgian, German, and Austrian intelligence and interrogation documents," this intelligence cell was "a combination of an internal police force and an external

operations branch, dedicated to exporting terror abroad," serving as a key cog in ISIS's "machinery for projecting violence beyond its borders."[24]

234.    The Emni became the crucial cog in the group's terrorism machinery, and its trainees led the Paris Bataclan Attacks and the Brussels Airport Attacks.

235.    From 2010 until his 2016 death, ISIS's Intelligence Cell was led by Abu Muhammad al-Adnani. Luqman also played a key role in ISIS's Intelligence Cell by first serving as Syria-level Emni director and then Adnani's deputy, before succeeding him in 2017.

236.    Lafarge Defendants' payments financed Abu Muhammad al-Adnani's, Abu Luqman's, and ISIS's Intelligence Cell's participation in the attacks that killed and injured Plaintiffs. From 2010 through 2017, the Intelligence Cell typically captured a substantial percentage of ISIS's protection revenue, including Lafarge Defendants' payments. Given this standard practice, Lafarge Defendants' payments likely delivered more than $1 million to Adnani, Luqman, and the Intelligence Cell.

237.    ISIS's public statements confirm that link. According to a 2014 ISIS publication, originally published by ISIS's propaganda arm al-Himma Library, ISIS used tax payments, like those made by Lafarge Defendants, to aid "[t]he mujahidin and jihad." That meant ISIS's cells in Syria, Iraq, and elsewhere ("the mujahidin") responsible for ISIS's attacks against the United States (ISIS's "jihad"), including the Intelligence Cell, which advanced "interests of war and fighting [for the sake of] Allah, like . . . keeping watch over the enemy and . . . and other things from what serves the interest of the fighting." ISIS also deployed those tax payments to "the collectors, preservers and dividers of" ISIS's

---

[24] Rukmini Callimachi, How A Secretive Branch Of ISIS Built A Global Network Of Killers, N.Y. Times (Aug. 3, 2016).

tax income. This allowed the ISIS cells that played a role in ISIS's protection rackets and associated hostage-taking attacks – both of which were true of the Intelligence Cell – to have more direct control over their terrorist operations.

      C.     <u>The Amount Of Money, And Concealment Of The Same, Were Both Significant</u>

238.     As explained above, money is the lifeblood of terrorism—especially for ISIS.

239.     From 2013-2014, the Lafarge Defendants caused at least several million U.S. dollars in terrorist finance to flow to the Islamic State.

      D.     <u>Lafarge Defendants Had Culpable Mental States</u>

240.     Lafarge Defendants had highly culpable mental states because Defendants occupied sophisticated positions as, respectively, one of the world's largest, most well- connected companies.

241.     Lafarge Defendants' robust culpability is also demonstrated by Lafarge Defendants' pattern and practice of rewarding its in-house terrorist financiers.

      E.     <u>Lafarge Defendants Had A Close Relationship To The Tortfeasors</u>

242.     Each Lafarge Defendant had close relationships to the relevant tortfeasors. Lafarge Defendants, through their intermediaries had relationships with the Islamic State.

243.     Lafarge Defendants structured their transactions with knowledge of the closeness of their relationship to the tortfeasor. Lafarge Defendants' attempts to interpose intermediaries between themselves and the Islamic State operatives to whom Lafarge Defendants' protection money was ultimately paid only highlights the closeness of Lafarge Defendants' relationship to the tortfeasors. This was the sort of actionable information upon which American counterterrorism strategy depended.

## XIII.  <u>LAFARGE DEFENDANTS' AID HAD A SUBSTANTIAL NEXUS TO THE UNITED STATES</u>

244.     Defendants' scheme depended on connections to the United States. Defendants' conduct had a substantial nexus to New York and to the United States in three different, but related ways:

(1) Defendants transferred money through correspondent banks located in New York; (2) Defendants purposefully used email servers located in the United States to avoid detection of their conspiracy; (3) Defendants engaged in a conspiracy with ISIS, whom Defendants knew were plotting and engaged in attacks against Americans and the United States.

## A. The Defendants Used the United States Banking System

245.    Throughout, Defendants exploited the United States banking system by executing at least 15 U.S.-dollar wire transfers they caused to clear through the United States. That was no coincidence. Defendants chose to pay in U.S. dollars – they called "USD" their "preferred option" – and they deliberately routed their U.S.-dollar wires through U.S. banks to support its scheme to fund ISIS, and Lafarge's officials knew those directions required the use of New York banks.

246.    Correspondent, or intermediary, banks are the conduit for a financial transaction when a sender's bank cannot perform a direct transfer in the desired currency with the recipient bank. Almost all correspondent banks that perform U.S. dollar transactions are located in New York, which allows them to use the U.S Clearing House Interbank Payments System ("CHIPS"). CHIPS estimates that in 2015 it was responsible for processing more than 95 percent of cross border transactions denominated in U.S. dollars.

247.    By using U.S. and New York correspondent and intermediary banks to clear those U.S.-dollar wires and/or transactions, Defendants advanced their criminal scheme: they made the payments look legitimate; avoided the operational risks posed by unreliable foreign-clearing options; supplied the terrorists with their preferred currency; and hedged against the foreign exchange risk posed by the collapsing Syrian pound.

248.    United States clearing helped them capture all those benefits. True, Defendants had a sophisticated understanding of U.S. sanctions, which sometimes forced them to avoid U.S. banks. But

they learned first-hand that doing so made their scheme less effective, more expensive, and harder to conceal. That is why they used U.S. clearing when they could, in a manner carefully designed to avoid triggering U.S. sanctions. And they knew, as Lafarge's accounting manager explained in one illustrative email, that their U.S.-dollar wires required the involvement of U.S. banks. In fact, Lafarge and LCS admitted in the Information connected with their guilty plea that a lump sum wire transfer of $210,000 from Lafarge's operating account at a financial institution in Paris passed through the Eastern District of New York to intermediary banks in New York City. The contract pursuant to which that payment was made required Defendants to make ongoing monthly payments of $30,000.

249.     Defendants' executives also sent emails confirming that numerous other payments in furtherance of their conspiracy with ISIS were made in U.S. dollars. Plaintiffs, on information and belief, believe that there have been at least 23 relevant transactions related to Defendants' terrorist-funding scheme that were denominated in U.S. dollars and used the New York financial system, although this is only a list of transactions available without discovery.

250.     On information and belief, Defendants made at least nine U.S.-dollar-denominated upstream payments and at least 14 U.S.-dollar-denominated downstream payments through the New York banking system. Upstream payments were the ones that Lafarge made, typically through Lafarge Cyprus, to send LCS money for operating expenses—including terrorist payments.

251.     Lafarge made downstream payments to Tlass (Intermediary 1) and Taleb (Intermediary 2) so that they could pay ISIS on Lafarge's behalf. The chart below, on information and belief, depicts each payment:

| Date | Category | Sender | Recipient | USD Amount |
|------|----------|--------|-----------|------------|
| 4/28/11 | Upstream | Lafarge Cyprus | LCS | $20,000,000 |
| 7/31/11 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 8/25/11 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |
| 8/25/11 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| 3/18/12 | Upstream | Lafarge Cyprus | LCS | $10,000,000 |

| 9/27/12 | Upstream | Lafarge Cyprus | LCS | $16,500,000 |
| 12/27/12 | Upstream | Lafarge Cyprus | LCS | $15,500,000 |
| July 2013 | Downstream | LCS | Tlass | $75,000 |
| August 2013 | Downstream | LCS | Tlass | $75,000 |
| September 2013 | Downstream | LCS | Tlass | $75,000 |
| 9/30/13 | Upstream | Lafarge Cyprus | LCS | $5,000,000 |
| October 2013 | Downstream | LCS | Tlass | $75,000 |
| November 2013 | Downstream | LCS | Tlass | $75,000 |
| December 2013 | Downstream | LCS | Tlass | $75,000 |
| January 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Tlass | $75,000 |
| February 2014 | Downstream | LCS | Taleb | $4,836 |
| March 2014 | Downstream | LCS | Tlass | $75,000 |
| April 2014 | Downstream | LCS | Tlass | $75,000 |
| May 2014 | Downstream | LCS | Tlass | $75,000 |
| June 2014 | Downstream | LCS | Tlass | $75,000 |
| 6/10/14 | Upstream | Lafarge Cyprus | LCS | $11,000,000 |
| 10/23/14 | Downstream | Lafarge Cyprus | Tlass | $210,000 |

252.    On information and belief, the nine upstream payments, totaling $98 million, were disbursements made under an April 7, 2011 loan agreement between Lafarge Cyprus and LCS to give LCS operational funding, including for the purpose of maintaining its conspiracy with ISIS.

253.    Lafarge's General Counsel and Corporate Secretary signed the loan agreement on Lafarge Cyprus's behalf and oversaw the first seven disbursements, and Lafarge's Assistant General Counsel oversaw the final two disbursements. Lafarge Cyprus funded LCS at Lafarge's direction and subject to its control. Indeed, Lafarge admitted it was responsible for the October 23, 2014 payment to Tlass although Lafarge structured that payment as nominally originating from Lafarge Cyprus. The other Lafarge Cyprus payments above similarly occurred at Lafarge's direction. Lafarge Cyprus sent the upstream payments in part by wiring U.S. dollars into accounts LCS maintained with Bank Audi in Lebanon and Syria. LCS in turn paid out the U.S. dollars to pay Taleb and Tlass to dole out to the terrorist groups with whom Lafarge conspired. Lafarge Cyprus's payment method was the best way for LCS to navigate sanctions on financial transfers to Syria.

254.    When Lafarge decided to make a $12 million disbursement on June 10, 2014, through Lafarge Cyprus, it had long known LCS was making payments ISIS through intermediaries—it was doing so with Lafarge executives' oversight and approval and for the purpose of continuing to make payments to terrorists. It also knew LCS was paying Tlass $75,000 in U.S. dollars monthly to compensate him for negotiating with ISIS. Lafarge still decided to pay LCS an additional $12 million in what, on information and belief, an email from its treasury manager called "fresh cash"—cash for terrorists.

255.    All but one of the 14 downstream payments was a monthly $75,000 payment LCS made to Tlass to enable his payments to ISIS and ANF. Lafarge's agreement with Tlass set that Tlass would "retain $50,000 and the remaining $25,000 would be disbursed to armed groups." The amounts were purposefully in U.S. dollars, for the purposes of stability and concealment described above. The payment of $210,000 included $150,000 to cover Tlass's monthly stipend from July and August 2014. On information and belief, U.S. dollar payments, which were required under the contract Defendants negotiated with Tlass, and which were also paid to intermediary Taleb, continued after October 2014 as Defendants continued to try to regain control of the cement plant into and after early 2015.

256.    Lafarge's U.S. dollar transactions almost certainly cleared through CHIPS, and thus through New York banks. Participating in the clearing system requires U.S. presence, in part to ensure that U.S. law will govern cross-border U.S.-dollar transactions. Most such banks' U.S. presence is in New York, since U.S. dollar clearing almost always requires access to the Federal Reserve Bank of New York.

257.    On information and belief, Defendants' U.S.-dollar transactions followed the norm and were sent via the New York banking system. This allegation is based on the specific banks Defendants used to effectuate these transactions, and on at least three examples of transactions that Lafarge and

Lafarge Cyprus specifically cleared through New York (beyond the one transaction to which it has admitted).

258.    Defendants may have used other banks, but they relied predominantly on three bank branches in funding their payments to terrorists: Bank Audi (Lebanon), Bank Audi (Syria), and BNP Paribas (Egypt). The use of these three banks supports the allegation that Defendants purposefully cleared their U.S.-dollar transactions through New York, because each bank cleared U.S.- dollar transactions through correspondent bank relationships with New York banks.

259.    LCS held accounts with Bank Audi SAL ("Bank Audi Lebanon") that it used to make many of its payments to Tlass and Taleb and to receive upstream funding from Lafarge and Lafarge Cyprus. Bank Audi Lebanon was based in Beirut and operated as the Lebanese branch of Bank Audi, a multinational bank. Bank Audi Lebanon maintained U.S.-dollar correspondent accounts at least at the following New York banks, all of which Bank Audi has publicly acknowledged:

| No. | Correspondent U.S. Bank Relationship in New York | Correspondent U.S. Bank SWIFT Code[25] |
|---|---|---|
| 1 | Standard Chartered Bank – NY | SCBLUS33XXX |
| 2 | JPMorgan Chase Bank, N.A. | CHASUS33XXX |
| 3 | The Bank of New York Mellon | IRVTUS3N |
| 4 | HSBC – NY | MRMDUS33XXX |
| 5 | Citibank, N.A. | CITIUS33XXX |

260.    Bank Audi Lebanon does not have independent dollar clearing capabilities. It processed Defendants' U.S.-dollar transactions through the New York banking system by routing their funds

---

[25] Some of these accounts were used for Eurodollar-related transactions that flowed through the U.S. banking system. On information and belief, Defendants likely used the same correspondent accounts to facilitate their U.S.-dollar-denominated transactions or used other correspondent accounts at the same banks to facilitate such transactions.

through Bank Audi's correspondent accounts with these New York banks, including but not limited to JPMorgan Chase's New York branch.

261.    Bank Audi Lebanon's standard settlement instructions support the conclusion that Defendants' transactions relied on New York correspondent accounts. Standard settlement instructions detail the accounts a financial institution will use to complete transactions depending on the currency the institution's customer selects. Before the relevant time frame, Bank Audi published its standard settlement instructions in the Banker's Almanac, an authoritative and publicly available compendium of international banking information. Those instructions, available to Defendants, specified that Bank Audi Lebanon typically settled U.S.-dollar wire transfers through its correspondent accounts at "The Bank of New York, New York" and "JPMorgan Chase Bank, National Association, New York."

262.    On information and belief, from 2011 through 2015, LCS used Bank Audi Syria S.A. ("Bank Audi Syria") as Bank Audi's branch in Damascus. On information and belief, at all relevant times, Bank Audi Syria faced significant obstacles conducting cross-border U.S.-dollar denominated transactions, which were impacted by U.S. sanctions. LCS relied on its U.S.-dollar accounts at Bank Audi Lebanon instead for U.S.-dollar transactions.

263.    On information and belief, in or about 2013, Lafarge and Lafarge Cyprus also instructed LCS to open an Egyptian bank account in the name of Lafarge's Egyptian subsidiary, Lafarge Middle East & Africa Building Materials, which Lafarge internally called "LMEA." On information and belief, LCS opened this LMEA Account at BNP Paribas's branch in Cairo. LCS regularly used its "LMEA Account" to make and receive U.S.-dollar payments, including by making a July 2013 payment of $75,000 from LCS to Tlass. Lafarge funded the account, via Lafarge Cyprus in U.S. dollars as needed, for LCS's benefit. On information and belief, Defendants used this account to make many suit-related U.S.-dollar payments, including several not listed among the twenty-three transactions in the table above.

264.    Like Bank Audi, BNP Paribas's subsidiaries clear their U.S. dollar transactions through New York. According to its 2012 Patriot Act certification, BNP Paribas's subsidiaries, including its Egyptian branch, relied on "correspondent banks in the United States." BNP Paribas's global Corporate and Investment Banking Group, of which it considered the LMEA Account a part, regularly relied on U.S. banks to clear the Group's U.S.- dollar transactions. Due to a highly publicized U.S. enforcement action in mid-2014, BNP Paribas was forced to suspend U.S.-clearing operations for a year. As a prominent French newspaper noted in reporting on that action, BNP Paribas recognized that its U.S.-dollar transactions for sanctioned entities exposed it to U.S. criminal penalties, because when "any dollar transfer passes through the United States to be cleared by the American financial system, [that] dollar transaction is automatically governed by U.S. law."

265.    On information and belief, BNP Paribas's Egyptian branch cleared U.S. dollars the same way until that suspension.

266.    BNP Paribas's standard settlement instructions confirm that Defendants transactions using the LMEA Account cleared in New York. Like Bank Audi, BNP Paribas published its standard settlement instructions in the Banker's Almanac. Before the relevant timeframe, BNP Paribas Egypt advertised its "Correspondent Banking" service and identified "BNP Paribas SA" as its "correspondent" bank in "New York." The standard settlement instructions likewise specified that BNP Paribas Egypt typically settled U.S. dollar wire transfers for its customers through its correspondent account with "BNP Paribas SA, New York."

267.    Plaintiffs are aware, on information and belief, of at least three transactions related to Defendants' terrorist-financing scheme that Defendants specifically cleared through New York banks. These examples were found without the benefit of discovery. The details of such transactions rest within Defendants' exclusive control, so many more examples likely exist.

| Date | Amount (USD) | Originating Bank/Originator | Beneficiary Bank/ Beneficiary | New York Correspondents |
|------|-------------|-----------------------------|-------------------------------|-------------------------|
| 8/25/11 | $5,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York<br>JP Morgan Chase |
| 8/25/11 | $10,000,000 | Citibank Dubai / Lafarge Cyprus | Bank Audi / LCS | Citibank New York<br>JP Morgan Chase |
| 10/23/14 | $210,000 | TBD (France)/Lafarge-Cyprus | TBD-Dubai/Tlass | TBD-New York |

268.    On information and belief, when Lafarge chose to make these payments through Lafarge Cyprus, it purposefully reached into New York to complete the transactions. For example, with the October 23, 2014 payment for Tlass's negotiations with ISIS, Lafarge directed Tlass to issue a $210,000 invoice from a Dubai shell company. On information and belief, Lafarge paid the invoice by directing its Parisian bank to initiate a wire transfer on behalf of Lafarge Cyprus, which sent funds through New York correspondent banks—including at least one in this District—to Tlass's bank account in Dubai. On information and belief, and part and parcel with their efforts to conceal their conduct, Defendants knew and intended for this transaction to use the U.S. financial system and to clear through New York.

269.    Given that these transactions formed part of a common course of conduct involving U.S. dollars, Defendants likely used the same (or similar) New York banks to route other U.S.-dollar transfers through New York. In general, customers and their banks follow similar routing processes to complete similar transactions in the same timeframes for the same currencies. Given that standard practice, and the other allegations above, these three examples are likely illustrative of Defendants' broader practice of using New York banks to complete the U.S.-dollar transactions in which they

systematically engaged as part of the conspiracy. Indeed, it is implausible that Defendants used New York banks for just these three transfers and not any of the myriad similar transactions alleged herein.

270.     Defendants' use of New York banks was material to their scheme.

271.     Using dollars made the conspiracy with ISIS easier and more efficient for participants, and more difficult for law enforcement and other outsiders to detect. While ISIS was not always paid in U.S. dollars, ISIS and Defendants preferred to do business with each other in U.S. dollars. Defendants' regular and deliberate use of U.S. dollar transactions, which in turn depended on their access to the New York banking system, was vital to the scheme's concealment and success. Their conscious choice to use U.S. dollars and New York banks offered at least three benefits.

272.     First, using U.S. dollars and U.S. banks helped Lafarge conceal their payments from outside auditors, regulators, and law enforcement officials. Concealment was of paramount importance, given the stringent U.S. and international sanctions targeting Syria at the time, and the illegality of the payments to terrorists. Lafarge's Syrian operations faced significant financial scrutiny. The use of U.S. dollars helped Defendants avoid the scrutiny of LCS's external auditors.

273.     Transactions in Syrian pounds raised red flags among regulators, auditors, and bank-compliance departments, while U.S. dollars were associated with legitimate cross-border transactions, particularly when routed to companies outside Syria. Lafarge's executives thus "preferred" its payments for ISIS and ANF be made in "bank transfer[s] in USD," to give its wire transfers the imprimatur of legitimacy associated with U.S.-dollar transactions.

274.     On information and belief, Lafarge funneled payments through a web of 54 different bank accounts (mostly at Bank Audi), including several routed through a personal account to keep certain transactions off Lafarge's books. Using such a large number of accounts made it even more difficult for others to detect the scheme. The excessive number of bank accounts, which Defendants actively created,

demonstrates a broader point: secrecy was vital, and Defendants were affirmatively involved in the financial machinations that enabled their scheme.

275.    Second, transacting in U.S. dollars protected Defendants and their agents from foreign-exchange risk and the plummeting value of the Syrian pound. At the beginning of 2012, the Syrian pound was trading against the U.S. dollar at roughly 54:1. By the end of 2014, it had depreciated to roughly 180:1—losing more than two-thirds of its value. This made Syrian pounds unappealing for any long-term deal. Indeed, Tlass demanded that Lafarge pay his monthly fee in U.S. dollars in part because the Syrian pound was losing value so rapidly as to become effectively worthless.

276.    Third, ISIS's preferred currency was U.S. dollars. Real-time public reports linked ISIS's fundraising and recruiting success to its stockpile of U.S. dollars, which is how ISIS fighters wanted to be paid. As Business Insider reported in 2015:

> According to [an ISIS defector], a large number of people are joining ISIS because they need money. After joining [ISIS], people are paid in US dollars instead of Syrian [pounds]. ISIS members receive additional incentives to fight for the group. "I rented a house, which was paid for by ISIS," Abu Khaled, who worked for ISIS's internal-security forces and "provided training for foreign operatives," [said]. "It cost $50 per month. [ISIS] paid for the house, the electricity. Plus, I was married, so I got an additional $50 per month for my wife. If you have kids, you get $35 for each. If you have parents, they pay $50 for each parent. This is a welfare state." And those financial benefits are not just limited to the organization's fighters.

277.    ISIS preferred U.S. dollars for goods it sold and to pay its fighters. According to the Independent, ISIS "promoted the idea that it was hitting the US economy by issuing its own currency but the organisation on the ground is doing exactly the opposite, having built a financial system entirely dependent on the US dollar."

278.    Using New York banks in furtherance of the conspiracy enabled Defendants to capture these benefits, and, through intermediaries, pass them along to ISIS. New York is the global hub of cross-border U.S.-dollar transfers for good reason: companies that wire their U.S. dollars through New York gain from the legitimacy, reliability, and speed offered by New York clearing. Transacting through other

clearing centers in Tokyo, Hong Kong, Singapore, and Manila is theoretically possible, but these require extra cost and time, and raise questions about why the transaction is exceptional, operational risks that New York clearing avoids.

279.    By routing their payments through New York, Defendants maximized the potency and concealment of their terrorist funding. Had Defendants attempted to route their U.S.-dollar payments differently, it would have stood out as unusual, risking the very type of outside attention from auditors and regulators Defendants were striving to avoid. Defendants knew that attempting to route U.S. dollar transactions through non-New York centers was inadvisable. In or around 2012, U.S. sanctions began impeding the ability to route U.S. dollars in and out of Syria. On information and belief, New York banks began refusing to process transactions they knew were for LCS or other Syrian actors. In 2013, when Taleb complained about LCS's lack of prompt payment, LCS employees said that New York correspondent banks were refusing to process their transactions, and tried to find other banks to complete the payment, creating further delays and expense.

280.    In response, Defendants structured transactions that would use the New York banking system to appear as though they were going somewhere other than Syria, for example through the LMEA Account in Egypt. Defendants told Tlass to create a Dubai company for Lafarge Cyprus's payment, to avoid Syrian contacts. These bank account locations enabled Defendants to route their U.S.-dollar payments through New York banks but still get money into Syria, which was faster and more reliable than the alternatives.

281.    For all the reasons above, had Defendants not chosen to reach into New York and use New York banks to transact in U.S. dollars, their scheme of sending payments to ISIS and ANF would have increased the risk of disruption of payments, been less effective, more expensive, and harder to conceal.

282.    Defendants' purposely used New York banks.

283.    Defendants' use of New York banks was deliberate. U.S. dollars were critical to Defendants' scheme with ISIS and intermediaries. Needing a safe, effective, and opaque means to transfer their cash, Defendants purposefully chose New York.

284.    Defendants' banks publicly advertised that they routed U.S. dollar transactions through New York. Bank Audi's public marketing also alerted Defendants to the New York connection. Specifically, Bank Audi's "Worldwide Correspondents" website disclosed that its U.S.-dollar transactions relied on banks in the "U.S.A." and "N.Y." (emphasis added):



285.    The Syrian government itself alerted Defendants that their U.S.-dollar transactions went through New York. In February 2006, the Syrian government issued Circular Number 10/15

requiring that all foreign-currency transactions for the government that had previously been denominated in U.S. dollars instead occur in Euros, specifically to "avoid settlement problems in the United States" caused by U.S.-dollar clearing through New York banks. That decision, of which Defendants knew, reflected the widespread understanding in Syria that any U.S. dollar transaction goes through U.S. banks.[26]

286.    Even non-privileged client alerts published by Lafarge's counsel alerted Defendants that their transactions used the U.S. banking system. While Shearman & Sterling LLP was advising Lafarge, it published an alert warning all its clients, including Lafarge, that the United States Department of Justice and Securities and Exchange Commission's guidance indicated an "expansive assertion of territorial jurisdiction over non-U.S. defendants" including "overseas financial transactions involving US dollars," because "virtually all such transactions clear through correspondent banking accounts in the U.S."[27] While Baker & McKenzie represented Lafarge, it alerted its clients about the same guidance, that "a wire transfer from or to a U.S. bank or otherwise using the U.S. banking system" may create U.S. jurisdiction based on the "use of correspondent bank accounts."[28]

287.    Finally, decades of media reports about CHIPS and correspondent banking also alerted Defendants that their U.S.-dollar transactions used New York banks, as far back as articles in the

---

[26] Al Jazeera, Syria Picks Euros Over Dollars (Feb. 14, 2006), https://www.aljazeera.com/news/2006/2/14/syria-picks-euros-over-dollars
[27] Shearman & Sterling LLP (Philip Urofsky, Stephen Fishbein, Danforth Newcomb, Patrick D. Robbins, Paula Howell Anderson, Richard Kreindler, Markus S. Rieder, Richard Kelly, Jo Rickard, Brian G. Burke, and Brian C. Wheller), Shearman & Sterling Client Publication: The New FCPA Guide: The DOJ and the SEC Do Not Break New Ground But Offer Useful Guidance and Some Ominous Warnings at 3 (Nov. 15, 2012), https://bit.ly/3RESGLU.
[28] Baker & McKenzie LLP (Paul J. McNulty, Joan E. Meyer, Robert W. Kent, Jr., John P. Cunningham, Crystal R. Jezierski, Peter B. Andres, and Erica C. Spencer), Baker & McKenzie Client Alert: Inside the U.S. Government's Highly-Anticipated FCPA Resource Guide at 2 (Nov. 16, 2012), https://bit.ly/46ywLu1.

American Banker in 1989,[29] the Los Angeles Times in 1991,[30] the Australian Financial Review in 2002,[31] the Mail on Sunday in 2004 (quoting a source as saying "[c]urrently, if you want to pay United States dollars from bank A to bank B, that transaction has got to go via New York."),[32] Newsweek International in 2006,[33] the Economist in 2013,[34] and GulfNews in 2014.[35] Thus, Lafarge officials, who ran one of the largest and most sophisticated multinational corporations in France, were aware of the substance of these reports, even if they had not read any of the reports themselves.

288.    Defendants' executives were aware of how Defendants' money was transferred quickly and effectively to and from LCS. A Lafarge email discussing its June 2014 loan to LCS demonstrates the degree of that involvement. In that email, Lafarge's treasury managers discussed the need for Lafarge (through Lafarge Cyprus) to "increase its outstanding subordinated shareholder loan" to LCS by "US$12m to give LCS a small buffer" to cover its ongoing U.S.-dollar shortfalls. In that discussion, Lafarge employees demonstrated an awareness of how to route the money. As the same email explained, the wire-transfer "process must start in the few coming days due to time needed to channel the funds to Syria through Lebanon, to lower the risk of cash being trapped by banks' compliance policies linked to sanctions affecting Syria." The reference to "Lebanon," on information and belief, referred to LCS's

---

[29] American Banker, Glossary Of Computer Technology Terms (Feb. 1, 1989), 1989 WLNR 1319450.

[30] Glas Frantz, Lax Rules Blamed in Bank Schemes, Los Angeles Times (Apr. 28, 1991), 1991 WLNR 3887729

[31] John Breusch, US Patriot Law Could Involve Local Banks, Australian Financial Review (Feb. 12, 2002), 2002 WLNR 15725873.

[32] John Mushayavanhu (Vice Chairman of Bankers Association of Zimbabwe), quoted in AllAfrica.com English, Local Forex Clearance System Expected Soon (Apr. 10, 2009)

[33] Christian Caryl et al., Pocketbook Policing: Washington Has Finally Found A Strategy That Is Putting Real Pressure On The Regime – Going After Its Sources Of Cash, All Across The World, Newsweek Int'l (Apr. 10, 2006), 2006 WLNR 5632771

[34] Economist, Digital Currencies: A New Specie (Apr. 13, 2013), 2013 WLNR 8890628.

[35] Babu Das Augustine, UAE To Sign FATCA Agreement Soon, Gulf News (Mar. 13, 2014), 2014 WLNR 6929583

account at Audi Bank Lebanon. Lafarge was thus aware of Bank Audi's correspondent-banking policies, and it sought to guard against the risk that using New York correspondent accounts would expose it to U.S. sanctions.

289.     The steps Defendants took to conceal their transactions confirm that their use of New York banks was deliberate, including by using an "LMEA Account" in Egypt, and ordering Tlass to open an account in Dubai. Both these accounts were intended to trick U.S. banks into completing transfers to circumvent U.S. sanctions against transactions in Syria, and to conceal the payments from French auditors and law enforcement officials. They made sense only if Defendants were actively seeking to use the New York clearing system. Indeed, if Defendants had the means to bypass New York clearing, for example, by operating solely in cash or by using offshore clearing, these accounts outside of Syria would have been entirely unnecessary.

290.     Defendants' executives regularly and purposefully received specific transaction confirmations alerting them to the particular New York correspondent and intermediary banks that routed their transactions. On information and belief, these confirmations typically took the form of SWIFT MT103 messages. SWIFT, which stands for the Society for Worldwide Interbank Financial Telecommunication, is the standard communications system for sending cross-border wire-transfer messages between financial institutions. An MT103 (or Message Type 103) is a standard message confirming the details of an executed transaction. Fields 53, 54, and 56 in an MT103 typically disclose the correspondent and intermediary banks involved. On information and belief, Lafarge (acting through Lafarge Cyprus) and LCS regularly requested and received SWIFT confirmations from their banks notifying them of the New York banks involved in clearing their transfers, as part of Defendants' process of approving the transactions.

291.     When Defendants instructed their banks to process these U.S.-dollar transfers, they intended to (and did) cause their banks to wire money using New York correspondent accounts. And when Defendants' banks carried out those instructions, they did so as Defendants' agents. In a cross-border wire transfer, the originating bank – the bank that first receives the order from the wire originator – carries out the transfer on its originator's behalf. The originator also exercises substantial control over the originating bank. Among other things, Defendants here specified each transfer's date, amount, and currency denomination. Each time, Defendants' banks had to follow Defendants' instructions. Those instructions here effectively mandated that Defendants' banks rely on New York clearing, on Defendants' behalf.

292.     Defendants also had the right to dictate the use of specific correspondent or intermediary banks. Thus, for each of their U.S.-dollar transactions that cleared in New York, Defendants could have required that their banks use non-U.S. correspondent accounts but consciously declined to so require. And even if Defendants were silent on that topic in their wire instructions, their silence would have required the originating banks to select correspondent banks that would complete the U.S.-dollar payment expeditiously and in accordance with ordinary standards of care in the banking industry. Defendants understood that those considerations in this context effectively dictated New York clearing as well.

293.     Defendants paid and were therefore alerted to banking fees for the New York banks that cleared their transactions. Correspondent and intermediary banks typically charge a fee for each wire transfer that they process, which can be paid in three ways; the specific payment mechanism is typically reported at Field 71A of the SWIFT MT103. Option one—denoted by "OUR"—has the originator cover the fees separately, on top of the amount transferred. For example, on information and belief, the SWIFT message for the $10 million U.S.-dollar upstream payment denoted above (see supra

¶¶ 251, 267) used the "OUR" option in Field 71A, meaning that Lafarge Cyprus separately paid JP Morgan Chase's fees to compensate it for its New York clearing services. Option two, denoted by "BEN," covers the fees by deducting them from the amount transferred. Option three, denoted by "SHA," is a mix of the two. In each scenario, the sender wires the money to the intermediary or correspondent bank to compensate that bank for the service of processing the transaction. Thus, when Defendants effectuated U.S. dollar transactions to pay terrorists and intermediaries, they knowingly elected how to pay those New York banks for the service. Defendants—not their originating banks—covered the payment of these fees into New York.

294.    On information and belief, Lafarge specifically approved at least one of the 2011 New-York-cleared transactions alleged above, after personally requesting the SWIFT confirmation disclosing that JPMorgan Chase's and Citibank's New York branches were involved in routing the transaction.

**B. Defendants Used U.S.-Based Email Providers To Veil Their Terrorist-Financing Scheme.**

295.    To evade detection of their conspiracy with terrorist groups, Defendants also reached into the United States and formed U.S. contacts by relying on American email providers –mainly Gmail – to communicate about their terrorist payoffs, thereby reaping the benefit of their email providers' U.S. presence, which also materially contributed to Defendants' scheme and enhanced their ability to pay terrorists. Again, this was no coincidence. Defendants often coordinated their payments using Gmail, rather than corporate email, so they could hide their conduct from French auditors and regulators. And in using Gmail to do so, Defendants relied on a U.S. service provider and benefited from U.S. infrastructure, U.S. engineering, and U.S. law. Because Gmail is an American service, U.S. legal protections also impeded foreign agencies from easily accessing Defendants' Gmail messages. By sending their emails through the United States, Defendants sought to make it harder for French law

enforcement – the authority otherwise most likely to criminally charge their executives (as has now in fact happened) – to discover their scheme.

296.    Lafarge's executives were explicitly instructed by their counsel to use personal email addresses, rather than their corporate accounts. These email addresses were primarily Gmail accounts. On information and belief, Defendants sent and received hundreds of scheme-related communications through these and other such accounts:

| Account Owner | Role of Account Owner | Email Address |
|---|---|---|
| Bruno Pescheux | CEO of LCS until July 2014 | brunopescheux@gmail.com |
| FirasTlass (Intermediary 1) | Defendants' agent and intermediary who paid ISIS on their behalf | Firastlass01@gmail.com |
| Mamdouh al-Khaled | LCS Purchasing Manager | Mamdouh.Lafarge@gmail.com |
| Hassan al-Saleh | LCS Plant Manager | Hassan.cement65@gmail.com |
| Ahmad Jamal | ISIS representative who supplied materials to LCS | Ahmad.jamal1966@gmail.com |

297.    Carrying out a criminal conspiracy via Gmail, rather than corporate email, matched standard practice among terrorists and their funders, who rely on cheap and easily available technologies that are anonymous, such as Gmail.

298.    Defendants' use of Gmail relied on extensive U.S. infrastructure. Google operated the majority of its data centers in the United States, which enabled Defendants' conspiracy-related emails to reach their destinations securely and reliably, including through regular backups, and to be concealed from Defendants' auditors and French law enforcement authorities.

299.    Defendants and their agents agreed to numerous U.S. contacts by agreeing to and regularly using their U.S. based Gmail accounts. They reached into the United States to make a contract with a U.S. company, including by agreeing to Google's Terms of Service, which in 2013 made clear that Gmail was "provided by Google, Inc. ('Google'), located at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States," regulated by the "laws of California, U.S.A."

300.     They also sent and received data and services from Google in the United States. Gmail relies on data-mining to serve targeted searches and sales to users. U.S. engineers provide the process to scrape data from emails for this customized advertising. That Google was an American company that was mining data from users' emails was no secret, even in 2014. International news sources reported that Gmail was free, but that Google mined personal data from its users. Thus, when Defendants signed up for Gmail and used it to carry out their scheme, they knew they were paying an American company for the American service they were using. Rather than sending a wire transfer delivering cash to their U.S. counterparty, they delivered their data.

301.     Additionally, because Gmail is based in the United States and operates under U.S. law, it is more difficult for foreign prosecutors and regulators to access. U.S. law at the time constrained releases of customer data to foreign governments, making the evidence nearly impossible for European law enforcement to access. Had Defendants chosen to use non-U.S.-based email, such as a free European email service, their communications would have been more susceptible to access by French regulators and law enforcement.

**C. Defendants Purposely Entered Into A Conspiracy With ISIS, Pursuant to Which ISIS Engaged In Acts That Targeted The United States**

302.     Defendants' conspiracy further linked its conduct to the United States. As the U.S. Attorney for this District explained, Lafarge supported ISIS "not merely in exchange for permission to operate its cement plant – which would have been bad enough – but also to leverage its relationship with ISIS for economic advantage." It was to Lafarge's economic advantage for ISIS to remain strong. The stronger ISIS's territorial control – and the more credible its threats against Lafarge's competitors – the more Lafarge benefited from its unusual willingness to do business in ISIS-held territory. And ISIS's terrorist violence was vital to that arrangement. There was no more potent way for ISIS to convey fear, and thus to stay in power, than to publicly terrorize Americans like the families of the victims who are

Plaintiffs here. Simply put, when ISIS attacked Americans in a show of terrorist strength, it bolstered the credibility of its protection racket and furthered the aims of the conspiracy Lafarge joined.

303.    Defendants have admitted, as part of its guilty plea, to conspiring with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within those countries.

304.    Defendants recognized that ISIS's terrorist activities were good for everyone's business. They expanded markets and drove out competition, leaving Lafarge to dominate. Lafarge's unusual willingness to pay ISIS gave it a unique opportunity to seize market share, and for the FTOs to expand their operations and commit more terrorist attacks.

305.    For the co-conspirators to continue to profit, ISIS needed to remain in control, expand its reach over territories and markets, and continue to tax and intimidate LCS's competitors. ISIS's constant violence, in turn, backed up its credible threat. Violence was crucial to the racket, because it made the population believe ISIS's willingness to back up its threats. When Defendants participated in ISIS's extortion and protection racket, it joined a conspiracy that was explicit in its purpose of making money through the perpetuation of terrorist violence.

306.    Unsurprisingly, and in line with its express statements, ISIS engaged in numerous overt acts both in and expressly aimed at the United States to further its terrorist aims. ISIS's global ambition and historical roots in al-Qaeda required that it target the United States and American citizens. These attacks ramped up as Defendants increased their payments, holding Americans captive and killing American hostages in gruesome video messages directed explicitly to the United States. As Deputy Attorney General Monaco stated in connection with Lafarge and LCS's guilty plea, during the Defendants' conspiracy, the rest of "the world watched in horror as ISIS murdered innocent journalists and aid workers," inflicting "unimaginable pain and suffering" on "American families whose loved ones

were brutally murdered by ISIS." Defendants only redoubled their efforts to work with ISIS as American forces conducted air strikes against ISIS to stop its siege of Yazidis in August 2014, and after ISIS publicly beheaded American journalists. ISIS publicly celebrated its horrific acts and was open about the fact, before and during the conspiracy, that it was targeting the United States.

307.    The United States' status as a global superpower meant that victimizing Americans was an especially effective way to convey ISIS's authority. ISIS's attacks on and crimes against U.S. citizens and their families in Syria, Iraq, Turkey, and elsewhere, including Plaintiffs, furthered Defendants' conspiracy with ISIS and intermediaries. These acts had symbolic value and allowed ISIS to tout that it could challenge the most powerful country in the world.

308.    ISIS also reached into the United States to further the conspiracy. Al-Qaeda in Iraq, ISIS's predecessor, threatened the United States numerous times, as did ISIS leaders. ISIS also recruited heavily from the United States, including from this District, drawing a total of approximately 300 U.S. citizens who joined or attempted to join its ranks. Its members sent and received money from U.S. citizens for attacks in the U.S., and in Syria and Iraq. ISIS propaganda officials tried to use events in Ferguson, Missouri and Baltimore, Maryland as recruiting tools.

309.    Defendants knew all of this, which is confirmed by their emails: "[W]e should not forget that ISIS is a terrorist movement." Defendants were also aware that the U.S. government had designated ISIS as an FTO. Defendants were familiar with the history of Al-Qaeda in Iraq, through their security consultant and Tlass (Intermediary 1). Attacks on Americans took place while Lafarge was actively handing millions of dollars to ISIS and were an easily foreseeable result of a conspiracy with a terrorist organization that expressly targeted Americans.

**D. Lafarge Merges With Holcim And Pleads Guilty To Conspiring To Provide Material Support To One Or More Foreign Terrorist Organizations.**

310.     In early 2014, Lafarge and Holcim, the two largest multinational building companies, began confidential discussions about entering into a share-purchase agreement.

311.     In July 2015, after more than one year of negotiations, Holcim completed its merger with Lafarge. Certain Lafarge executives who had been aware of Lafarge's payments to ISIS remained in leadership positions in the newly formed company, LafargeHolcim.

312.     On February 19, 2016, a website run by an opposition group to the Syrian regime reported that Lafarge and LCS had purchased raw materials from and made other payments to ISIS. The report included partially redacted images of emails sent to and from Lafarge and LCS executives' email accounts, discussing payments to ISIS.

313.     On April 24, 2017, after retaining a U.S. law firm to conduct an investigation, LafargeHolcim issued a press release acknowledging that Lafarge and LCS were in business with terrorists: as "terrorist groups designated by the US and the EU were expanding into the area" of the Cement Plant, LCS made "payments" to intermediaries to "avoid direct contact with these armed groups." LafargeHolcim admitted that "LCS management kept Lafarge SA well-informed of developments."

314.     On October 18, 2022, the Department of Justice announced in a press release that Lafarge and LCS pleaded guilty to a one-count criminal information in the Eastern District of New York charging them with conspiring to provide material support to ISIS and ANF in violation of 18 U.S.C. § 2339(B)(a)(1).58 It was the first time the Department of Justice had ever brought such charges against a company.

315.     The Department of Justice's Press Release also stated that U.S. District Judge William F. Kuntz II sentenced Lafarge and LCS to terms of probation and to pay financial penalties, including criminal fines and forfeiture, totaling $777.78 million.  None of that money has gone to the Plaintiffs,

who are damaged as a result of the conduct described herein and are entitled to recover against the Defendants, and each of them.

316.     In the release, Deputy Attorney General Lisa O. Monaco said, "The defendants partnered with ISIS, one of the most brutal terrorist organizations the world has ever known, to enhance profits and increase market share—all while ISIS engaged in a notorious campaign of violence during the Syrian civil war."

317.     Assistant Attorney General Matthew G. Olsen of the Justice Department's National Security Division also said, "The defendants routed nearly six million dollars in illicit payments to two of the world's most notorious terrorist organizations—ISIS and al-Nusrah Front in Syria—at a time those groups were brutalizing innocent civilians in Syria and actively plotting to harm Americans…. There is simply no justification for a multi-national corporation authorizing payments to designated terrorist organizations."

**XIV.   ISIS Committed, Planned, And Authorized The Attacks That Injured Plaintiffs**

318.     Islamic State committed, planned, and authorized the Paris Bataclan and Brussels Airport attacks.

319.     The U.S. government issued one or more reports to Congress that concluded that Islamic State executed each attack against Plaintiffs herein.[36]

320.     ISIS issued several claims of responsibility for the attacks.

**XV.    THE ISLAMIC STATE ATTACKS**

_____

[36] *See e.g.,* U.S. Dep't of State, *Country Reports on Terrorism 2016,* https://www.state.gov/reports/country-reports-on-terrorism-2016 (last visited Dec. 13, 2024) ("…around the globe, returning foreign terrorist fighters and homegrown violent extremists carried out attacks directed, assisted, or inspired by ISIS. The attacks in Brussels on March 22, carried out by the same operational cell that conducted the November 2015 Paris attacks, . . .  are examples of this.")

A.    The Paris Bataclan Theater Attack

321.    On November 13, 2015, ISIS organized and coordinated multiple attacks in Paris, killing one-hundred and thirty (130) people and wounding and injuring over 350 more innocent people. The Paris attacks consisted of three teams from an ISIS terror cell including suicide bombers and men armed with assault rifles. Teams of ISIS operatives attacked the Stade de France in Paris during an international soccer game between France and Germany where then-President of France Francois Hollande was in attendance.

322.    Upon information and belief, three operatives committed the attack at the Stade de France by detonating suicide vests as they approached the Stadium.

323.    On the same day and approximately at the same time, ISIS gunmen attacked cafes on Boulevard Voltaire. They opened fire with Kalashnikov rifles before detonating suicide belts and vests.

324.    The deadliest attack occurred at the Bataclan Theatre, a concert venue, where at least eighty-nine (89) people died and at least ninety-nine (99) others were taken to the hospital in critical condition. Plaintiff Helen Jane Wilson was severely injured in the Paris Bataclan Theatre Terrorist Attack.

325.    During the Paris Bataclan Theatre Terrorist Attack, three ISIS operatives entered the concert hall and opened fire with Kalashnikov rifles before exploding suicide vests.

326.    Hours after the attack, ISIS released a video through its propaganda arm, the Al-Hayat Media Centre showing a bearded fighter, speaking in Arabic, calling on French Muslims to carry out attacks in France.  Shortly after releasing the video, ISIS officially claimed responsibility for each of these attacks citing recent French airstrikes in Syria, insults directed at the prophet Muhammad and

general disgust with French and western civilization as its motives.  The authenticity[37] of ISIS's claim has been verified by several Western government and intelligence officials.

327.      Before, during and after it carried out the Paris Bataclan Attack, ISIS was being overtly and covertly supported and aided the Defendants.

328.      Defendant's sponsorship of, and provision of material support and resources to ISIS must be understood in terms of the totalitarian nature of the Syrian regime, and in the context of Syria's long, storied, and sordid history of employing terrorism as a tool for advancing its domestic and international agendas.

1.      *Helen Jane Wilson – Paris Bataclan Attack*

329.      On November 13, 2015, Ms. Wilson was with her friend, Mr. Nick Alexander, who was travelling with the Eagles of Death Metal, the band scheduled to play at the Bataclan Theatre that evening, as he worked selling merchandise and souvenirs near the theatre's entrance.

330.      At 9:40 p.m. the first gunshots went off, vividly making popping and crackling noises over the sound of the electric guitars on stage. As Ms. Wilson noticed the gunmen, they opened fired into the crowd again. Mr. Alexander immediately pulled Ms. Wilson to the ground, using his body to protect hers. The couple played dead underneath a table for as long as possible.

331.      While Mr. Alexander and Ms. Wilson were trying to hide, a gunman came toward their counter and opened fire. Two bullets ripped through Ms. Wilson's thighs, missing her femoral artery by one inch.  Mr. Alexander was killed in the Bataclan Attack – he passed away in Ms. Wilson's arms inside the theatre. Fortunately, Ms. Wilson escaped from the theatre.

---

[37]      https://www.theguardian.com/world/live/2015/nov/14/paris-terror-attacks-attackers-dead-mass-killing-live-updates?page=with:block-5646c398e4b06fb53392c5df#block-5646c398e4b06fb53392c5df

332.     Although Ms. Wilson survived the attack after receiving a transfusion in the ambulance, she suffered severe physical and psychological short-term, long-term, temporary and/or permanent injuries. Her injuries include but are not limited to muscle and nerve damage in both legs which affects her ability to sit, stand and/or walk for extended periods of time, significant scarring in both legs as a result of the bullet wounds she sustained, severe psychological trauma including Post Traumatic Stress Disorder ("PTSD") which includes insomnia, flashbacks, depression, and panic attacks. In addition, she suffers from digestive issues affecting her digestive system, liver and pancreas, all of which are result of the stress she has experienced following the Bataclan Attack.

333.     Ms. Wilson still experiences chronic pain in both legs. Walking for long periods of time is painful. As a result of these injuries which did and continue to affect her ability to enjoy and experience everyday life, she receives medical treatment for her physical injuries. In addition, she participates in twice-weekly psychological counseling to address her PTSD and other psychological injuries. She takes regular medications to address all of these physical and psychological injuries. She is required to see her doctors regularly for treatments with her legs, as a result of her permanent disabilities suffered as a result of the terror attack.

### B.     The Brussels Airport Attack

334.     Plaintiff victims also include Chaim Winternitz, B.W., Carolyn G. Moore, Melchizedek Martinez, Kianni Martinez, Kimo Martinez, Ka.M, N.M, Joseph D. Empey, Richard I. Norby and Mason Wells, each of whom suffered physical injuries in the Brussels Airport Attack. Plaintiff victims also include the Estates of (i) Justin Shults, (ii) Stephanie Shults, and (iii) Gail Martinez, each of whom were murdered in the Brussels Airport Attack. Plaintiffs also include the near family members of each victim, each of whom are entitled to bring claims herein as a result of the death or injuries of their loved ones.

335.     Early in the morning on March 22, 2016, Ibrahim el Bakraoui, Nadim Laachraoui, and Mohamed Abrini walked together through the Brussels Airport in Zaventem, Brussels, Belgium ("Brussels Airport" or "Airport") disguised as would-be travelers. All three of them were carrying deadly bombs.

336.     Shortly before 8:00 am local time, the three bombers separated to different places within the main terminal. At 7:58am, the first bomber detonated his bomb.

>     *1.     The Winternitz Family*

337.     Prior to the first bomb being detonated, Mr. Winternitz and his brother-in-law, Mr. Farkash, were at the check-in area of the main terminal of the Airport waiting to board their flight to Israel.

338.     They were in Brussels for Mr. Farkash's brother, Aharon's, wedding, with 13 relatives and close family friends, including Mr. Winternitz's wife, Esther, and daughter, BW, as well as Mr. Farkash's sister.

339.     Just before the attack started, Esther went back to the counter to receive her value added tax (VAT) refund. Mr. Winternitz impulsively asked Esther to take B.W. with her, which she did.

340.     Hearing the bomb, Mr. Winternitz turned to Mr. Farkash and asked in Yiddish, "Mendy (Mr. Farkash) was that a bomb?"

341.     They immediately ran towards the main entrance; Mr. Winternitz pushing his suitcase cart.

342.     Esther and B.W. were still at the counter claiming the VAT and were not in the immediate vicinity of the bombs.

343.     As everyone scrambled away from the first explosion, a second bomb went off near the main Airport entrance 37 seconds after the initial explosion.

344. The second bomb threw Mr. Winternitz several feet into the air. The bomb caused burns on most of his body, shattered his right leg and lodged fragments of shrapnel in his legs, abdomen and head. His left eardrum was pierced. He suffered severe, permanent and painful injuries. B.W. was in the zone of danger, as she was close enough to experience significant trauma from being in the airport at the time of the attack. At the time of the attack, B.W. feared for her own life, as well as the life of her mother and her father. B.W. saw and experienced the horrific scenes with her own eyes and ears. She saw people who were burned and severely injured, and she heard the sounds of their cries and smelled the aftermath of the explosions.

345. Mr. Winternitz was barely able to walk when a stranger came over to him to an emergency room located within the airport.

346. Mr. Winternitz spent three hours in the emergency area without being able to contact his family. During this time, his wife Esther and daughter B.W. could not locate him and feared he was dead.

347. Eventually, Mr. Winternitz was able to contact his mother from the airport emergency area. She then communicated to Esther that Chaim was indeed alive, but it took another six hours for them to be reunited. B.W.'s mother decided that B.W. should not see her father in his mangled condition and arranged for other relatives to take her back home to Israel. Travelling back the day after the attack without her parents by her side was traumatic for B.W. who was crying and terrified of flying.

348. From the airport emergency area, Mr. Winternitz was transported by ambulance to the local Erasme Hospital. Upon arrival, x-rays were taken and may of his wounds were stitched closed. The medical personnel at Esrame Hospital told him that his leg might need to be amputated because of the severity of the injury.

349. Later that evening Mr. Winternitz was transferred from Esrame Hospital to AZ Monica Hospital in Antwerp, Belgium. At AZ Monica Hospital, Mr. Winternitz underwent surgery on his right leg and he was admitted to the ICU.

350. Mr. Winternitz remained in AZ Monica Hospital for ten days. During this time, each day he was transferred to ZNA Stuivenberg Hospital for therapy on his eardrum.

351. Eventually, on March 31, 2016 Mr. Winternitz was able to be transferred back to Israel by private air ambulance so that he could be admitted to Hadassah University Medical Center in Jerusalem, Israel for the remainder of his recovery and rehabilitation. The private medical transportation was paid for and arranged by family and friends.

352. Once admitted to Hadassah University Medical Center, Mr. Winternitz underwent additional surgeries. These included surgeries on his leg and additional procedures to remove shrapnel from his back and head.

353. While at Hadassah Hospital Mr. Winternitz underwent daily physical therapy.

354. Mr. Winternitz remained continuously hospitalized at Hadassah Hospital until April 22, 2016, one month after the attack.

355. The attack caused Mr. Winternitz to permanently lose all hearing in his left ear.

356. Mr. Winternitz suffered significant injuries to his legs. It was not until eight months after the attack that Mr. Winternitz was finally able to walk again, however, Mr. Winternitz still needs crutches to walk. B.W. is in therapy because of the attack.

*2.    Justin and Stephanie Shults*

357.    Justin and his wife Stephanie met at Vanderbilt University where they graduated in 2008. They married in 2011. Justin and Stephanie were both certified public accountants.

358.     Justin Shults worked for a company called Clarcor, and often flew back and forth between the United States and Belgium.

359.     Stephanie's job at Mars, Incorporated took Justin and Stephanie to Belgium in 2014 where they were living at the time they both were murdered at the hands of the ISIS terrorists in the Brussels Airport Attack.

360.     Stephanie's mother, Carolyn G. Moore, was visiting Justin and Stephanie in Belgium prior to and at the time of the attack. Carolyn was scheduled to fly home to Lexington, KY in the morning of the attack on March 22, 2016. Justin and Stephanie took Carolyn to the airport for her flight home.

361.     After saying their goodbyes outside of the security screening, a bomb was detonated murdering both Justin and Stephanie and also injuring Carolyn, all to their damage.

        3.     *Carolyn G. Moore*

362.     After having been driven to the Brussels Airport by her daughter Stephanie and son-in-law Justin, Carolyn G. Moore entered the Brussel Airport.  When the ISIS terrorists detonated their bombs, Carolyn G. Moore was thrown to the ground onto her back with great force and was knocked unconscious.

363.     Carolyn G. Moore had visited with Stephanie and Justin for a week in Belgium and was heading back to Kentucky on the morning of the attack. It was a cool morning, and Justin had no jacket on. They all joked about that and how Stephanie and Carolyn were all bundled up.

364.     The three of them entered the airport together. Justin told his mother-in-law that she needed to pull her own suitcase so there would be no security issues.

365.     Initially Carolyn could see Stephanie and Justin as she stood in line. They were sitting in chairs facing the lines. As the section became more crowded, Carolyn was unable to see them

anymore. Then she heard a loud boom and saw a big flash of light above her. She was thrown to the ground and knocked unconscious.

366.    Carolyn awoke to a young lady trying to pull her backpack from under her. The young lady grabbed her backpack and yelled "run" before running herself. Carolyn stood up and looked around. The floor was gray, and it looked like the ceiling was on the floor. Carolyn remembers yelling for Stephanie for about a minute. After not being able to find Stephanie or Justin, Carolyn exited the airport through a broken window that had been shattered by the explosion.

367.    Carolyn told a woman she encountered outside the airport that she was looking for her daughter and son-in-law. The woman told Carolyn that everyone had to evacuate to a parking lot a few meters away and suggested that Stephanie and Justin may have been evacuated to another area.

368.    Carolyn was directed to some buses to be transported to safety to what she believed was a stadium. She went into an office and told them she was still looking for her daughter. They said they would look for her. They then connected Carolyn with a social worker who spoke English.

369.    Carolyn suffered hearing loss in the blast and could not hear from her right ear. She was given some medicine.

370.    Carolyn was taken to a hotel by the police where she waited to find her daughter and son-in-law and also waited for her family to arrive from the United States. Her husband, Geary Moore, and Justin's mother and stepfather, Sheila and Jon Shell, had flown to Belgium when they learned of the terrorist attack.  Carolyn, Geary and Justin's parents wanted to look for Justin and Stephanie at hospitals, but the social worker had no idea which hospital they could be at.  The families agonizingly remained in Belgium for about 4 or 5 days before they learned that Justin and Stephanie had been killed in the attack and their remains had been found. Their families were permitted to view the bodies before they were flown back to the United States for burial.

371.    The next day the Shults/Shell and Moore families flew home. After a few weeks, Justin and Stephanie's bodies were flown to Dover Airforce Base. The families held a combined funeral, and Justin and Stephanie are buried together in Lexington, KY.

372.    Carolyn has suffered greatly as a result of not only the heinous murder of her daughter and son-in-law, but also of her own physical and emotional injuries, all to her damage.

4.    *Gail and Melchizedek Martinez, Kianni Martinez, Kimo Martinez, Ka.M., and N.M.*

373.    Melchizedek "Kato" Martinez and his wife Gail and four children, Kianni, Kimo, Ka.M, and N.M, were temporarily living in Brussels, Belgium as a family and were traveling to enjoy a family trip to Walt Disney World in Orlando, Florida.

374.    The family of six traveled together to Brussels Airport at around 5:30am for their 9:30am flight. They stood in line at the airport to retrieve their tickets and check their luggage. Kato went to the restroom and came back. Gail was next to him. Kianni was to the right of him with the other Martinez children.

375.    At that moment, no less than three feet behind them, a terrorist denoted a bomb.

376.    Kato was blasted forward and knocked unconscious. He was in and out of consciousness for some time. When he came to, he realized he suffered significant injuries including to his left leg which was severely damaged.

377.    He looked around and realized that everyone who was within a 2 -foot range of the explosion appeared to be dead.

378.    Despite his severe injuries and pain, Kato's adrenalin allowed him to search for his family.  Kato found his daughter, Kianni, underneath a pile of bodies. Her left leg was blown apart.   She was going into shock. After trying to comfort her, he continued searching for his wife and other children.

379.    Kato then found his wife, Gail. He tried to help her before realizing she did not have a pulse, and he believed she was dead. However, he alerted the first responders and asked them to care for his wife, hoping that he was wrong, and that she was still alive.

380.    Unable to find his other children, Kato knew his adrenaline was subsiding and he was going into shock, and would probably lose consciousness soon, so he also asked the first responders to take Kianni. As the first responders were taking Kianni, Kato recalls her yelling "don't go".

381.    Kato eventually lost consciousness and the next thing he remembers, he was waking up and being resuscitated. He was taken to the hospital to be treated. He had 3rd degree burns over his entire body, a bullet wound in his left leg.  He also had a left ankle fracture, and shrapnel in his scalp, arms and legs.

382.    He eventually learned that all of his children were down the hall from him in the hospital also being treated for their injuries. Kianni's injuries included her left leg which was blown apart. She also had 3rd degree burns and shrapnel all over her body. Kimo's injuries included 3rd degree burns over 40% of his body and he was in a coma. Ka.M. was also in a coma with 3rd degree burns all over and blast injuries to her legs.  His youngest daughter N.M.'s injuries included 3rd degree burns and blast injuries, all to the damage of each of them.

5.    *Joseph Dresden "Dres" Empey*

383.    Joseph Dresden ("Dres") Empey had been serving as a missionary for one year and nine months for The Church of Jesus Christ of Latter-day Saints ("Church") in the Paris, France, mission when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

384.    On the day of the attack, Dres Empey and two other fellow missionaries, plaintiffs Richard Norby, an Elder of the Church, and Mason Wells were at the airport's check-in hall

accompanying a fourth missionary, who was on her way to a mission assignment in Ohio, when the ISIS terrorists detonated their explosives.

385.    After waiting in the line to check in for her flight for only a few minutes, the bomb exploded. Dres was knocked unconscious by the blast.

386.    After a few minutes, Dres regained consciousness. As he came back into consciousness, he heard an extremely loud ringing in his ears and people yelling. He had no idea what had just happened until the memory of the fact that he was just standing in a line at the airport came back to him. He was laying on his right side, and as he opened his eyes, he saw mostly gray and smoke. When he tried to stand up, he saw people lying all over the floor.

387.    He realized that there had been an explosion. His first thought was to look for the other three people in his group. He walked around and saw the different people lying on the floor.  Many of them were screaming and asking for his help. After looking with no success, Dres went to a large concrete pillar and stood behind it for a second with the fear that there still might be more terrorists or an additional attack. The front doors of the airport were 10-15 meters in front of him, and after leaning against that square pillar for a short while, he moved to the front door.

388.    Immediately after exiting, Dres found another of his fellow missionaries alive but also injured. It was Mason Wells.

389.    As Dres was talking with Mason, he looked over and saw a man in a suit laying on the ground that he thought might be Richard Norby. He limped over to the man in the suit and confirmed that it was indeed Richard Norby. He was severely injured. He appeared to have suffered burns and a severe injury to his leg; which had been snapped in the opposite direction.

390.    After a while, first responders came to attend to Dres and the others. He then received an IV with pain medication. He was placed in an ambulance and taken to the hospital. Once arriving at the hospital, Dres was taken out of the ambulance and began receiving treatment.

391.    As a result of the bombing, Dres suffered severe burns and injuries.  Recovery from his injuries has been an extensive process.  He spent a few weeks in recovery in Brussels and then subsequently for an extended period after he returned home to the United States, all to his damage.

    6.    *Richard Norby*

392.    Richard Norby had been serving as missionary President for The Church of Jesus Christ of Latter-day Saints ("Church") when he was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

393.    While waiting in line at the check-in counter with his fellow missionaries, Richard Norby was severely injured when ISIS terrorists detonated a bomb. Richard recalls a loud explosion, chaos and being thrown to the ground. He could see the smoke and destruction. He looked at his hands and thought it was soot, so he tried to wipe it off only to realize that his skin was coming off. Approximately 10 seconds later, another bomb was detonated.  He was trying to gain his footing and run only to realize that his leg was also injured, and he collapsed to the ground. He called his wife, Pam, who was living with him in Belgium.

394.    Pam recalls Richard calling her and telling her he had been injured in the terrorist attack at the Brussels Airport and they had been burned and thought his leg was broken.  Hearing this from Richard made Pam feel helpless that she was unable to be with her husband and assist.  He was listening to the screams and cries of people that he was unable to assist. Pam was distraught and fearful for Richard and felt helpless as she was not there.

395.     Richard next recalls waking up in a triage area adjacent to the airport. They put placards on each person that were color coordinated by priority. Richard was in the airport triage area for about 2 hours before he was transported to a hospital.

396.     Richard's injuries were significant. They included 2nd and 3rd degree burns over 35% of his body. His fibula was broken in two places, his heel was fractured, and his body was littered with shrapnel from head to toe.

397.     He had to have staples in the back of his head. The punctures on his back were too wide to staple so they just had to heal. He has skin grafts on his right hand. His left hand had shrapnel that caused nerve damage.

398.     Richard's right leg had a wound seven inches long, his calf had a shrapnel would that was two inches wide and a half inch deep.

399.     While in the hospital, Richard developed a fever and was showing signs of significant blood loss.  Richard had additional surgery to remove a large piece of shrapnel that was causing the bleeding. He also had issues with his toes because of nerve damage from the right leg.

400.     Richard continues to experience lack of function and pain as a result of his injuries.

401.     He has needed additional treatment and surgeries because of his permanent injuries and experienced long-term difficulties in his recovery, all to his damage.

        7.     *Mason Wells*

402.     Mason Wells, a missionary for The Church of Jesus Christ of Latter-day Saints, was at the Brussels Airport at the time of the ISIS terrorist attack which occurred at the Brussels Airport.

403.     He was there with his fellow missionaries, Plaintiffs Richard I. Norby and Joseph "Dres" Empey and another female missionary who they were accompanying to the airport for her flight back to the United States.

404.     The group was waiting in the line to check in the female missionary for her flight when the first bomb exploded. Mason recalls the force of the blast catapulting him a distance from where he has been standing.

405.     When Mason realized what had happened, he became overcome by fear, uncertainty, and the threat of death.

406.     As the smoke cleared, all Mason could think about was his fellow missionaries and the need to get out of the airport to safety. However, his injuries made that a challenging feat. His legs and foot had been shredded by shrapnel and he was burned all over. Although he was afraid to try to move, he was even more afraid to stay where he was.

407.     Mason finally mustered up the energy and bravery to make a run for it. He dragged his bloodied and mangled body out of the airport and collapsed onto the sidewalk where he was cared for by a young woman.

408.     A few minutes later, Mason was delighted to see that his fellow missionary, Joseph Dresden Empey, and also Mission President Richard Norby, although also severely injured, had also made it out of the airport to safety.

409.     Mason's injuries were very severe. He had third degree burns, numerous lacerations, a cracked heel bone and a ruptured Achilles tendon. Mason spent the next two months in hospitals; first in Belgium, then back home in Utah. He underwent numerous surgeries and surgical procedures and was told he may never run again.

410.     Mason has scars all over the lower half of his body and continues to deal with the trauma of the horrific memories of that day, all to his damage.

**ISIS Claims Responsibility for Brussels Airport Attack**

411.     After the Brussels Airport bombings, another explosive was detonated on the Brussels

metro during rush-hour traffic. ("Metro Attack").

412.    Khaled el-Bakraoui detonated his bomb on the Metro just over an hour after the second Airport bomb, killing himself and many of the other passengers in his metro car.

413.    This fourth explosion brought the total number of deaths to thirty-two (32) and injuries up to three-hundred and forty (340).

414.    Immediately following the Brussels Airport and Metro Attacks, ISIS claimed responsibility for the terrorist bombings through a news agency affiliated with the Islamic State, the Amaq Agency.

415.    The Brussels Airport and Metro Attacks were each organized, committed and coordinated by ISIS.

416.    ISIS helped provide training, weapons, explosives, and other assistance in order to maximize the murderous capabilities of the terrorist attackers.

417.    Brussels was susceptible to attack due to the large number of native Belgians who have traveled to Syria to join ISIS and have been able to return to Belgium because of their Belgian passports.

418.    Brussels is also a largely symbolic target as it is home to the European Union and NATO headquarters.

419.    The terrorists targeted international flight counters, murdering approximately thirty-two (32) people from fourteen (14) different countries including Belgium, Britain, China, France, Germany, Hungary, India, Israel, Italy, Morocco Netherlands, Peru, Poland, Sweden, and the United States.

420.    The terrorists attacked passengers as young as 20 and as old as 79, indiscriminately killing and maiming the elderly, women, and children. Videos show primary school aged children fleeing from the Airport after the explosions.

421.    The Brussels Airport attack was carried out by suicide bombers, Ibrahim el Bakraoui, Khaled el-Bakraoui, and Nadim Laachraoui, all three of whom were born in Belgium.

422.    A fourth would-be-bomber, fellow Belgian Mohamed Abrini, fled the Airport after the first two bombs went off but before his explosive detonated. Abrini was later apprehended and interrogated.

423.    All four men are of Moroccan descent.

## CLAIMS FOR RELIEF

### COUNT I
### VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(d)
### [JASTA Conspiracy Liability]

424.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

425.    Plaintiffs allege that Defendants conspired with ISIS, who committed an act of international terrorism, within the meaning of 18 U.S.C. § 2333(d) which Congress has found to provide "civil litigants with the broadest possible basis" for relief against those "that have provided material support, directly or indirectly, to foreign organizations or persons that engage in terrorist activities against the United States." JASTA, § 2(b).

426.    The ISIS bombing attacks in Paris and Brussels proximately caused plaintiffs' injuries.

427.    These ISIS attacks were acts of international terrorism as defined by 18 U.S.C. § 2331(1). First, ISIS's attacks involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws. Second ISIS's acts appear to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third,

ISIS's attacks occurred outside the territorial jurisdiction of the United States, and transcended national boundaries in terms of the means by which they are accomplished, the persons they appeared intended to intimidate or coerce, and the locale in which their perpetrators operated.

428.    These attacks were committed by an FTO so designated on the date of the attacks because the United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

429.    Defendants are the "person who … conspire[d] with the person [here, ISIS] who committed [the] act of international terrorism" under 18 U.S.C. § 2333(d)(1) and 1 U.S.C. § 1, which defines "person" to include corporations, companies, associations, firms, partnerships, societies, and joint stock companies.

430.    Defendants conspired by, in part, making an agreement with an FTO to, among other activities and goals, provide material support for those organizations in violation of 18 U.S.C. § 2339B, including by agreeing to make cash and covert payments through foreign shell companies to ISIS and purchasing raw material from, and making anti-competitive agreements with, ISIS.

431.    Defendants and ISIS also agreed to structure transactions to conceal and disguise the nature, location, source, or ownership of Defendants' material support or resources, in further violation of 18 U.S.C. § 2339A.

432.    It was reasonable and foreseeable that, as part of the conspiracy and in furtherance of the scheme to support acts of international terrorism, that ISIS would, and in fact did, commit acts of international terrorism, including the bombing attack against Plaintiffs.

433.    ISIS's bombing attack that injured Plaintiffs was foreseeable results of Defendants' support for ISIS's terrorist activities.

434.    Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

435.    The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are liable therefore.

436.    As a result of Defendants' violation of 18 U.S.C. § 2333(d), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, jointly and severally as against the Defendants, and each of them.

### COUNT II
### VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(d)(2)
### [JASTA Conspiracy Liability; Protection-Racket Predicate]

437.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

438.    Defendants entered a conspiracy with ISIS whose overall object was to maintain ISIS's territorial control of Syria and Iraq and thereby promote ISIS's protection rackets within that territory, in violation of (among other statutes) 18 U.S.C. §§ 2339A, 2339B, and 2339C.

439.    ISIS's acts of international terrorism targeting U.S. citizens, including the attacks that killed and injured Plaintiffs, furthered the overall object of Defendants' conspiracy and were a foreseeable consequence of that conspiracy.

440.    Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

441.    Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

442.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS. They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

443.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, and Niger; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, Turkey, and Niger; and to affect the conduct of the governments of Syria, Iraq, the United States, Turkey, and Niger by means of mass destruction, assassination, and kidnapping.

444.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

445.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by ISIS . Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

446.    The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover

the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are liable therefore.

447.    As a result of Defendants' liability under 18 U.S.C. § 2333(d)(2), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, for which the Plaintiffs and each of them should be awarded Judgment against the Defendants, and each of them, jointly and severally.

**COUNT III**
**VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(d)(2)**
**[JASTA Conspiracy Liability; Material-Support Predicate]**

448.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

449.    Defendants also entered a related conspiracy with ISIS and ANF with the overall goal of providing material support for those organization in violation of 18 U.S.C. § 2339B. Defendants, ISIS, and ANF also structured their transactions to disguise the nature of their support, in violation of 18 U.S.C. § 2339A. These FTOs foreseeably attacked civilians, including U.S. civilians, throughout the conspiracy, with Defendants' knowledge.

450.    Continuously since 2004, the United States has designated ISIS and ANF as FTOs, under various names, under 11 U.S.C. § 1189.

451.    Lafarge and LCS pleaded guilty in the United States District Court for the Eastern District of New York to conspiring to provide material support to ISIS and ANF, in violation of 18 U.S.C. § 2339B(a)(1).

452.    The terrorist attacks that killed or injured Plaintiffs or their family members were acts of international terrorism committed by ISIS. They were violent acts and acts dangerous to human life that violated the criminal laws of the United States and many States, or would have violated those laws had

they been committed within the territorial jurisdiction of the United States or of the States, including 18 U.S.C. §§ 844(f)(2) or (3), 956(a)(1), 1114, 1203, 1361, 2332, 2332a, 2332b, 2339C(a)(1)(B), and 2339D.

453.    The terrorist attacks committed by ISIS and/or ANF were intended to intimidate and coerce the civilian populations of Syria, Iraq, the United States, Turkey, and Niger; to influence through intimidation or coercion the policy of the governments of Syria, Iraq, the United States, Turkey, and Niger; and to affect the conduct of the governments of Syria, Iraq, the United States, Turkey, and Niger by means of mass destruction, assassination, and kidnapping.

454.    The terrorist attacks committed by ISIS and/or ANF occurred primarily outside the territorial jurisdiction of the United States and transcended national boundaries in terms of their means, locations, and intended audiences.

455.    Plaintiffs are U.S. nationals who were injured in their persons, properties, and/or businesses by reason of the terrorist attacks committed by ISIS. Plaintiffs suffered economic, physical, and emotional injuries proximately caused by the attacks; are survivors and/or heirs of U.S. nationals who suffered such injuries; or both.

456.    The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are liable therefore.

457.    As a result of Defendants' liability under 18 U.S.C. § 2333(d)(2), Plaintiffs are entitled to recover economic and non-economic damages, including solatium damages, for which the Plaintiffs and each of them should be awarded judgment, jointly and severally, against the Defendants, and each of them.

## COUNT IV
## VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) and 2339A
## [Providing Material Support to Terrorists]

458.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

459.    Defendants agreed to, and did in fact, provide to ISIS material support or resources, as defined in 18 U.S.C. § 2339A(b)(1), by transferring to ISIS millions of dollars, some of which constituted currency and transfers through U.S. banks, and by providing ISIS with cement, which Defendants produced in further of their conspiracy with ISIS, and which ISIS sold for its own benefit to further terrorist attacks.

460.    Defendants also structured their transactions with ISIS to conceal or disguise the nature, location, source, or ownership of Defendants' support.

461.    At the time of this material support, Defendants intended, knew, or were deliberately indifferent to the fact that ISIS would use such material support or resources to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members, in violation of any of section 32, 37, 81, 175, 229, 351, 831, 842(m) or (n), 844(f) or (i), 930(c), 956, 1091, 1114, 1116, 1203, 1361, 1362, 1363, 1366, 1751, 1992, 2155, 2156, 2280, 2281, 2332, 2332a, 2332b, 2332f, 2340A, or 2442 of this title, section 236 of the Atomic Energy Act of 1954 (42 U.S.C. 2284), section 46502 or 60123(b) of title 49, or any offense listed in section 2332b(g)(5)(B) (except for sections 2339A and 2339B).

462.    Defendants' conduct constitutes a violation of 18 U.S.C. § 2339A for providing material support to terrorists.

463.    A violation of 18 U.S.C. § 2339A provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

464.     Defendants' violation of 18 U.S.C. § 2339A constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339A. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

465.     Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

466.     The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are liable therefore.

467.     Defendants and each of them are therefore jointly and severally liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339A.

**COUNT V**
**VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) and 2339B**
**[Providing Material Support or Resources to a Designated FTO]**

468.     The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

469.     Defendants conspired to, and did in fact, provide to ISIS material support or resources, as defined in 18 U.S.C. § 2339A(b)(1), by transferring to ISIS millions of dollars, some of which

constituted currency and transfers through the U.S. banks, and by providing ISIS with cement, which Defendants produced in further of their conspiracy with ISIS, that ISIS sold for its own benefit to further terrorist attacks.

470.    The United States has designated ISIS as an FTO under § 219 of the Immigration and Nationality Act (8 U.S.C. § 1189) since 2004 under the name Al-Qaeda in Iraq.

471.    At all relevant times, Defendants knew that ISIS was a designated FTO.

472.    At all relevant times, Defendants also knew that ISIS had engaged in and was "engaging in terrorist activity" under 8 U.S.C. § 1182(a)(3)(B)(iii)-(iv), and/or "engaging in terrorism" under 22 U.S.C. § 2656f.

473.    At the time of this material support, Defendants intended, knew, or were deliberately indifferent to the fact that ISIS would use such material support or resources to prepare for or carry out terrorist attacks, such as the attacks that killed and injured Plaintiffs and their family members.

474.    Defendants' conduct constitutes a violation of 18 U.S.C. § 2339B for providing material support to terrorists.

475.    Indeed, Defendants pleaded guilty to violating 18 U.S.C. § 2339B in the Eastern District of New York on October 18, 2022.

476.    A violation of 18 U.S.C. § 2339B provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

477.    Defendants' violation of 18 U.S.C. § 2339B constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support to an FTO and conspiracy to do so involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339B. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence

the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

478.    Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

479.    The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are accordingly jointly and severally liable therefore.

480.    Defendants are therefore jointly and severally liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339B.

## COUNT VI
## VIOLATION OF THE ATA, 18 U.S.C. §§ 2333(a) and 2339C
### [Providing Terrorist Financing]

481.    The Plaintiffs repeat and re-allege each and every allegation set forth above with like effect as if alleged herein.

482.    In violation of 18 U.S.C. § 2339C(a)(1)(B), Defendants conspired to, and did in fact, provide ISIS with funds with the intention that such funds be used, or with the knowledge or intentional disregard of the fact that such funds are to be used, in full or in part, to carry out acts intended to cause death or serious bodily injury to a civil, or to any other person not taking an active part in the hostilities in a situation of armed conflict and the purpose of ISIS's acts was to intimidate a population, in the United States, Turkey, or Israel, or to compel the governments of any of those three nations to do or abstain from doing any act.

483.    In violation of 18 U.S.C. § 2339C(a)(1)(c), Defendants also knowingly concealed or disguised the nature, location, source, ownership, or control of any material support or resources, or any funds or proceeds of such funds knowing that the support or resources were provided in violation of 18 U.S.C. § 2339B or knowing that they would be provided in violation of 18 U.S.C. § 2339(a).

484.    A violation of 18 U.S.C. § 2339C provides Plaintiffs with a cause of action against Defendants under § 2333(a) for harm caused by an act of international terrorism.

485.    Defendants' violation of 18 U.S.C. § 2339C constitutes an act of international terrorism under 18 U.S.C. § 2331(1). First, Defendants' provision of material support to an FTO and conspiracy to do so involve violent acts or acts dangerous to human life that are a violation of U.S. criminal laws, specifically 18 U.S.C. § 2339C. Second, Defendants' support for ISIS appears to have been intended (a) to intimidate or coerce the civilian populations of the United States, Turkey, or Israel, (b) to influence the policy of the United States, Turkey, or Israel by intimidation and coercion, and (c) to affect the conduct of the United States, Turkey, or Israel by mass destruction, extrajudicial killing, assassination, and kidnapping/hostage taking. Third, Defendants' provision of material support to ISIS occurred primarily outside the territorial jurisdiction of the United States.

486.    Furthermore, Plaintiffs are U.S. nationals or their estates, survivors, or heirs injured by reason of Defendants' conduct.

487.    The Lafarge Defendants materially contributed to the ability of ISIS to commit the attacks in question.  The Holcim Defendants, who failed or refused to do the necessary due diligence to discover the illegal conduct of Lafarge, which they acquired, are the successors in interest to the Lafarge Defendants and are liable therefore. Defendants are therefore jointly and severally liable to Plaintiffs under 18 U.S.C. § 2333(a) for violation of 18 U.S.C. § 2339C.

## COUNT VII
## SUCCESSOR LIABILITY OF HOLCIM DEFENDANTS

488.    Plaintiffs repeat and re-allege all allegation of the foregoing paragraphs as if fully set forth herein.

489.    In accordance with the Purchase Agreement dated July 10, 2015, the Holcim Defendants assumed all of the assets and liabilities of the Lafarge Defendants and therefore became successor-in-interest to Lafarge Defendants continuing to operate the business of the Lafarge Defendants.

490.    The Holcim Defendants are liable for the acts the Lafarge Defendants to the same extent that the Lafarge Defendants would be found liable.

491.    The Holcim Defendants are liable for the Lafarge Defendants violations of 18 U.S.C. §§ 2333(a), 2333(d), 2339A, 2339B and 2339C.

## JURY DEMAND

492.    In accordance with Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

493.    Plaintiffs request that the Court:

(a)    Enter judgment declaring that the Holcim Defendants are the Successors-in-Interest to the Lafarge Defendants, and that the Plaintiffs are entitled to judgment against each of them, jointly and severally;

(b)    Enter judgment against Defendants finding them jointly and severally liable and award the Plaintiffs compensatory damages under the Anti-Terrorism Act, 18 U.S.C. § 2333;

(c)    Enter judgment against the Defendants, jointly and severely,  awarding Plaintiffs treble damages  for any compensatory damages awarded under the Anti- Terrorism Act pursuant to 18 U.S.C. § 2333(a);

(d)    Award Plaintiffs their attorney's fees and costs incurred in this action, pursuant to 18 U.S.C. § 2333(a);

(e)  Grant Plaintiffs leave to amend this Complaint in accordance with the Federal Rules of Civil Procedure and as the interest of justice may require;

(f)  Award Plaintiffs prejudgment interest;

(g)  Grant a jury trial on all issues so triable; and

(h)  Award Plaintiffs any such further relief the Court deems just and proper.

Dated:  April 9, 2025

Respectfully submitted,

/s/ Noel J. Nudelman
Noel J. Nudelman
Richard D. Heideman (to be admitted pro hac vice)
Tracy Reichman Kalik (to be admitted pro hac vice)
Joseph H. Tipograph
HEIDEMAN NUDELMAN & KALIK, P.C.
5335 Wisconsin Avenue, NW
Washington, DC 20015
 (202) 463-1818

*Counsel for All Plaintiffs*